**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant*,

v.

SEPTEMBER MCCONNELL,
                        *Defendant*,

and

JAMES EVANS,
                *Defendant-Appellee*.

No. 14-10024

D.C. No.
3:13-cr-00079-
LRH-WGC-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued September 11, 2014
Submitted May 14, 2015
San Francisco, California

Filed May 20, 2015

Before: Stephen Reinhardt, Raymond C. Fisher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Criminal Law

The panel vacated the district court's order granting James Evans' motion to suppress evidence of illegal drugs and a firearm found in a search of his car following a traffic stop, and remanded.

Applying *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), the panel held that, by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which he stopped Evans, an officer prolonged the traffic stop beyond the time reasonably required to complete his traffic mission, and so violated the Fourth Amendment, unless there was independent reasonable suspicion justifying each prolongation. The panel remanded to the district court for consideration in the first instance of whether the officer's prolongation of the traffic stop was supported by independent reasonable suspicion.

### COUNSEL

Elizabeth O. White (argued), Appellate Chief and Assistant United States Attorney; Daniel G. Bogden, United States Attorney, Reno, Nevada, for Plaintiff-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Janice A. Hubbard, Reno, Nevada, for Defendant-Appellee James Evans.

**OPINION**

BERZON, Circuit Judge:

The United States appeals the district court's order granting James Evans' motion to suppress evidence of illegal drugs and a firearm found in a search of his car following a traffic stop. We vacated submission pending the Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and now hold that the officer's prolongation of the traffic stop to conduct both an ex-felon registration check and a "dog sniff" violated the Fourth Amendment unless the officer had independent reasonable suspicion to support the prolongations. Because the district court did not address whether the officer had such reasonable suspicion, we vacate and remand.

I.

A.

Over the course of 2012 and 2013, Detective Blaine Beard, a Washoe County Sheriff's Deputy assigned to the Drug Enforcement Administration (DEA) task force in Reno, Nevada, received information from two jailhouse sources that Evans was distributing methamphetamine in the Reno-Sparks

area.[1]    Beard never "confirm[ed]" or "verif[ied]" this information, however, as, according to him, the task force didn't "have the time at that point to dedicate towards an investigation into Mr. Evans."

In the summer of 2013, Beard met with an informant, who had played a minor role in a different investigation Beard was conducting into drug activities in the area. Beard testified that the informant told him that he "had traveled to the Sacramento Valley on more than one occasion with Mr. Evans for the purpose of picking up a load of methamphetamine from a source of supply in that area," and that Evans was picking up five to ten pounds of methamphetamine every two to three weeks. According to the informant, Evans would stay at a Super 8 Motel a few miles from the supply source, acquire the "load," and return the following day to Nevada.

Based on this information, Beard obtained authorization from a state court judge to obtain "pings" showing the location of a cell phone Beard believed Evans was using for drug distribution activities. In the early evening of July 22, 2013, Beard received GPS ping data showing that the cell phone was leaving Nevada, traveling westbound. Later that night, the cell phone pinged from a parking lot of a Super 8 Motel in Sacramento. Beard requested that two officers with the Sacramento County Sheriff's Office drive by the Super 8

---

[1] This background is pieced together from both the audio-video recording of the traffic stop that the government introduced into evidence without objection, and the law enforcement officers' testimony at the suppression hearing. As we discuss below, however, the district court did not make factual findings at the hearing. We thus express no opinion as to the testimony's credibility.

Motel to verify that the car suspected to be Evans' was at that parking lot. At roughly 1:30 AM, the Sacramento County officers confirmed the suspected car was in the lot.

Beard subsequently contacted Deputy Brandon Zirkle, a deputy sheriff in the Washoe County Sheriff's Office whom Beard had known for "years." Zirkle was canine-certified and had his dog, Thor, with him that day. Thor was trained in the detection of controlled substances.

Beard supplied Zirkle with information about Evans' car, explaining that the DEA suspected Evans was traveling from California with narcotics and that Beard was receiving GPS location information from Evans' phone. Beard asked Zirkle to assist him by positioning his patrol car on the I-80 highway and pulling Evans' car over once it traveled past Zirkle. Beard specifically requested that Zirkle "develop [his] own probable cause to stop [the car]" to "possibly keep this event separate from [Beard's] ongoing investigation."[2]

Following this conversation, Zirkle parked his patrol car on I-80 on the Nevada side of the California-Nevada border and waited for Evans' vehicle to drive by. Beard, who had been monitoring the GPS pings from Evans' cell phone throughout the day, learned that Evans left the Super 8 Motel in the morning and drove east to Grass Valley, California, where he stopped for several hours. At around 6:37 PM,

---

[2] According to Zirkle, this type of stop — known as a "wall stop" — is "basically a stand-alone case that would stand alone based on the initiating officer's own probable cause . . . without jeopardizing the ongoing investigation." That is, "the traffic stop [was to be] independent and clear from the [DEA] investigation . . . to protect the [DEA's] information and the data and identities of the sources of information."

DEA officers observed the suspected vehicle traveling eastbound on I-80 about forty-five minutes west of Reno. Beard relayed this information to Zirkle, who had been waiting near I-80 for almost eleven hours.

Shortly after he was told that Evans was traveling eastbound towards him, Zirkle observed a Chevrolet El Camino with the reported license plate making a lane change that caused the vehicle behind it to apply its brakes. After following Evans for approximately a mile to a safe location, Zirkle pulled Evans over for violating two Nevada traffic laws prohibiting unsafe lane changes and following a vehicle too closely. *See* Nev. Rev. Stat. §§ 484B.223(1)(b) & 484B.127(1). The traffic stop began at 7:09 PM.

Approaching the car from the passenger's side, Zirkle asked Evans for his license and registration. Zirkle testified that he smelled a "very strong odor of methamphetamine" coming from inside the vehicle. Zirkle then asked Evans to get out of the car. After telling Evans that he had made an unsafe lane change, Zirkle asked Evans where he was coming from; Evans answered that he was heading back to Reno from Grass Valley[3] where he had stayed for a couple days with friends. Zirkle patted down Evans for weapons, then asked him to wait by the patrol car while he "checked some numbers" on the El Camino.

After checking the El Camino's vehicle identification number, Zirkle walked to the car and asked the passenger, September McConnell, for her identification. According to

---

[3] Grass Valley, California, is a few miles from Nevada City, California. Both the parties and the district court judge used the names "Grass Valley" and "Nevada City" interchangeably.

Zirkle, McConnell appeared to be feigning sleep; Zirkle also testified that McConnell's hands were shaking and that her pulse was racing in her neck to the extent that he could see the heartbeat in her carotid artery. In response to Zirkle's questions, McConnell stated they were coming from California, where they had stayed one night with Evans' friend. At 7:13 PM (four minutes into the stop), Zirkle informed Evans, who remained standing by Zirkle's patrol car, that he was not going to write a ticket, but that he needed to run a check for outstanding warrants before letting him go.

Zirkle returned to his patrol car to prepare a records check, which reveals whether the driver's license is valid and whether any warrants are outstanding for the holder's arrest. Evans approached Zirkle twice to inform him that he had had trouble with his license and child support in the past, but that it had been straightened out. Upon further questioning, Evans also informed Zirkle that he had been arrested before. Zirkle then contacted the police dispatch operator to call in a records check. As Zirkle was calling in the records check, Nevada State Trooper Jason Phillips appeared on the scene and spoke with both Evans and McConnell.[4] Minutes later, at nearly 7:20 PM, the operator returned with a clean records check on the car, as well as on Evans' and McConnell's driver's licenses.

Zirkle then requested an ex-felon registration check on Evans, as he had typed Evans' name into the patrol car computer and learned that Evans had a prior felony arrest record. The check entailed inquiring into Evans' criminal history and then determining whether he was properly

---

[4] Zirkle had contacted Phillips earlier, telling him to wait until Zirkle had stopped the vehicle and then come to cover Zirkle on the stop.

registered at the address he provided to Zirkle.**[5]**  As he was awaiting the results of the ex-felon registration check, Zirkle testified that he sought "to see if [Evans] would continue to give him the story that he gave . . . or change his story." Zirkle asked Evans why McConnell had told him that they had stayed in a motel, knowing that she had said they had stayed with friends.  According to Zirkle, Evans now said that he and McConnell stayed at a motel in Sacramento before driving to a friend's house in Grass Valley.  Zirkle told Evans that he was just waiting on the results of the ex-felon registration check, and that, if it returned with a proper registration, Evans would be free to leave.

Zirkle and Phillips then entered the patrol car and discussed for several minutes what they had heard from Evans and McConnell.  Phillips told Zirkle that he smelled a strong odor of marijuana coming from the car; Phillips did not mention smelling methamphetamine.  After this conversation, Zirkle asked Evans, who remained standing outside the patrol car, what he had been in prison for.  Evans answered that it had been for "counterfeiting."

---

**[5]** Nevada requires any "convicted person" within the state for a period of 48 hours or more to register with the county sheriff or chief of police. *See* Nev. Rev. Stat. § 179C.100(1).  A "convicted person" includes any person convicted in Nevada of "a category A felony" or "two or more offenses punishable as felonies." *Id.* § 179C.010(1)(a)–(b).  Registration involves submitting a written form with information including the person's name, description of his or her person, the "kind, character and nature of each crime of which the person has been convicted," and the address of the person's residence. *Id.* § 179C.100(4).  Failure to register is a misdemeanor. *Id.* § 179C.220.

At 7:26 PM, Zirkle called in to check on the status of the ex-felon check. The dispatch operator indicated she was on the phone with the records department to confirm everything.

At 7:28 PM, more than eight minutes after Zirkle called in the ex-felon registration check, dispatch informed Zirkle that Evans had been convicted two times for "drug-related charges," and that he was properly registered. Zirkle gave Evans a warning, returned his license and paperwork, and shook his hand, informing him that "you're good to go."

Immediately after Evans began to walk away, however, Zirkle asked Evans if he could ask a few more questions. Evans turned and walked back to Zirkle. Zirkle inquired whether Evans had any contraband in the car, mentioning marijuana, methamphetamine, cocaine, and heroin; Evans denied having any drugs. Zirkle then asked for Evans' consent to search the car. Evans refused to consent.

At this time, "[b]ased on everything [he] had seen in the stop," Zirkle believed he had "reasonable suspicion to keep [Evans] there further to run a narcotic detection dog around the exterior of the vehicle." Zirkle told Evans he was going to deploy Thor around the exterior of the car and ordered McConnell out of the car. After spending about three minutes preparing Thor, Zirkle began to walk the dog around the vehicle. Thor then allegedly alerted to the passenger door of Evans' car, indicating to Zirkle that he was "in the odor of a controlled substance." According to the dispatch log, the canine alert was entered at 7:33 PM — about twenty-four minutes after the traffic stop began. Zirkle told Evans and McConnell that they were no longer free to leave, and prepared to conduct a search of the car. Shortly thereafter, several agents from DEA arrived.

The resulting search turned up a doubled-bagged ziplock sandwich bag containing methamphetamine and "small bag[s]" of marijuana and crack cocaine, all of which were contained in a "hard sunglass case . . . located in between the driver and passenger seat of the vehicle." Zirkle also found an unloaded firearm in McConnell's backpack. Evans and McConnell were arrested.

B.

Evans and McConnell were indicted and charged with conspiracy to distribute and possess with intent to distribute five grams and more of methamphetamine; possession with intent to distribute five grams and more of methamphetamine; and carrying a firearm during and in relation to a drug trafficking crime. Evans was also charged with being a felon in possession of a firearm.

Evans moved to suppress the evidence seized from his car, arguing, inter alia, that Zirkle unlawfully prolonged the traffic stop by (1) continuing to detain Evans while he ran the ex-felon registration check, and (2) conducting the dog sniff "after the traffic stop was completed." The government responded that Zirkle had developed reasonable suspicion, if not probable cause, of illegal drug activities in the course of the traffic stop, and that the dog sniff was therefore justified. The government did not specifically address Evans' contentions regarding the ex-felon registration check.

Following an evidentiary hearing in which both Zirkle and Beard testified, the district court orally granted Evans' motion. Observing that "this is a classic subterfuge traffic stop," the court concluded that "this kind of a traffic stop for an extended period of time was an unlawful seizure . . . [in]

violation of federal law." The court therefore held that as Evans was "seized beyond the amount of time that's reasonable under our constitution," the search was "an unlawful one."

At a detention hearing two months later, the district court ordered Evans conditionally released pending the government's appeal.

II.

We review *de novo* the district court's ruling on a motion to suppress and for clear error the district court's underlying findings of fact. *See United States v. Turvin*, 517 F.3d 1097, 1099 (9th Cir. 2008).

Evans does not dispute that Zirkle had probable cause that he had committed a minor traffic violation, and that, therefore, the initial traffic stop was lawful. But "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In particular, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

*Rodriguez v. United States* recently fleshed out these principles. In *Rodriguez*, a police officer, Struble, stopped Rodriguez for "veer[ing] slowly onto the shoulder of [the highway] for one or two seconds" in violation of Nebraska traffic law. 135 S. Ct. at 1612. After collecting Rodriguez's license, registration, and proof of insurance, Struble ran a records check on Rodriguez. *Id.* at 1613. Once the records

check on Rodriguez was complete, Struble returned to the vehicle, asked for the passenger's driver's license, and began to question the passenger about "where [they] were coming from and where they were going." *Id.* Struble again returned to his vehicle, where he completed a records check on the passenger. *Id.*[6] Once the record checks were completed, Struble returned to the vehicle "to issue [a] written warning" to Rodriguez for the traffic violation. *Id.*

Although Struble conceded that the reasons for the traffic stop at this point were "out of the way," the officer nonetheless asked Rodriguez for permission to walk his dog around the vehicle. *Id.* After Rodriguez refused, Struble instructed Rodriguez to exit the vehicle and wait for the arrival of a second police officer. Several minutes later, after a deputy sheriff arrived, Struble "retrieved his dog and led him twice around the [vehicle]." *Id.* The dog alerted to the presence of drugs, and a subsequent search of the vehicle revealed a "large bag of methamphetamine." *Id.* "All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs." *Id.*

Rodriguez was indicted for possession with intent to distribute methamphetamine. *Id.* He moved to suppress the evidence obtained from the car search, arguing that the stop was unreasonably prolonged by the dog sniff in the absence of reasonable suspicion to extend his detention. *See id.* Although the district court found that Struble lacked independent reasonable suspicion to extend the detention

---

[6] Rodriguez did not challenge Struble's prolongation of the traffic stop to conduct the records check on the passenger, and the Court did not address it.

once he had issued the written warning, it determined that the seven-to-eight minute extension of the stop was "only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible." *Id.* at 1613–14. Accordingly, it concluded that the prolongation did not violate the Fourth Amendment's prohibition on unreasonable seizures. The Eighth Circuit affirmed, holding that the delay constituted an acceptable *de minimis* intrusion. *See United States v. Rodriguez*, 741 F.3d 905, 907–08 (8th Cir. 2014), *vacated and remanded*, 135 S. Ct. 1609 (2015). The court declined to address the district court's conclusion that Struble lacked independent reasonable suspicion to extend the detention. *See id.* at 908.

The Supreme Court vacated the judgment, explaining that, like a *Terry* stop, a traffic stop is "'[a] relatively brief encounter,'" in which "the tolerable duration of police inquiries . . . is determined by the seizure's 'mission.'" *Rodriguez*, 135 S. Ct. at 1614 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998), and *Caballes*, 543 U.S. at 407). This "mission" is limited to "address[ing] the traffic violation that warranted the stop" and "attend[ing] to related safety concerns." *Id.* "Authority for the seizure thus ends," *Rodriguez* held, "when tasks tied to the traffic infraction are — or reasonably should have been — completed." *Id.* Tasks not related to the traffic mission, such as dog sniffs, are therefore unlawful if they "add[] time" to the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing. *Id.* at 1616.

In so holding, *Rodriguez* specifically rejected the government's argument that an officer can prolong a traffic stop to conduct a non-traffic-related task "so long as the officer is reasonably diligent in pursuing the traffic-related

purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.* As the Eighth Circuit had not addressed whether "reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation," the Supreme Court remanded the case. *Id.* at 1616–17.

### III.

Applying *Rodriguez*, we hold that, by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which he stopped Evans, Zirkle "prolonged [the traffic stop] beyond the time reasonably required to complete" his traffic "mission," and so violated the Fourth Amendment, unless there was independent reasonable suspicion justifying each prolongation. *Id.* at 1612 (quoting *Caballes*, 543 U.S. at 407) (internal quotation marks omitted).

### A.

When stopping an individual for a minor traffic violation, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 1615 (alteration in original) (quoting *Caballes*, 543 U.S. at 408). "[S]uch inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as these checks are aimed at "ensuring that vehicles on the road are operated safely and responsibly." *Id.*

After stopping Evans, Zirkle performed vehicle records and warrants checks, tasks that are "ordinary inquiries

incident to the traffic stop." *Id.* (alteration and internal quotation marks omitted). *After* completing those record checks, Zirkle then requested an additional one — an ex-felon registration check on Evans, to inquire as to Evans' criminal history and confirm whether Evans was registered at the address he provided to Zirkle. A little over eight minutes after calling in the ex-felon registration check, dispatch informed Zirkle that Evans had been convicted two times for "drug-related charges," and that he was properly registered at the address he had given Zirkle.

The ex-felon registration check, unlike the vehicle records or warrants checks, was wholly unrelated to Zirkle's "mission" of "ensuring that vehicles on the road are operated safely and responsibly." *Id.* Rather, it was "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (alteration in original) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). Indeed, Zirkle himself testified that when he decided to run the various checks, he believed he had "something more than a simple traffic violation here." That the ex-felon registration check "occur[ed] before . . . the officer issue[d] a ticket" is immaterial; rather, the "critical question" is whether the check "prolongs— *i.e.*, adds time to — the stop." *Id.* at 1616 (internal quotation marks omitted). The ex-felon registration check in this case took approximately eight minutes; in other words, almost *half* of the duration of the pre-dog sniff detention can be attributed to the dispatch operator's processing of Evans' criminal history and ex-felon registration. During this processing time, Zirkle continued to pose questions to Evans, many of which had no relation to the traffic violation or Evans' prior whereabouts.

Put another way, all "tasks tied to the traffic infraction [had been] — or reasonably should have been — completed"

by the time Zirkle instigated the eight-minute ex-felon registration check. *Id.* at 1614. Consequently, Zirkle violated Evans' Fourth Amendment rights to be free from unreasonable seizures when he prolonged the traffic stop to conduct this task, unless he had independent reasonable suspicion justifying this prolongation.[7]

To be sure, *Rodriguez* recognized that "an officer *may* need to take certain negligibly burdensome precautions in order to complete his mission safely," as traffic stops can be "especially fraught with danger to police officers." *Rodriguez*, 135 S. Ct. at 1616 (emphasis added) (internal quotation marks omitted). But, as discussed, the time it took to complete the ex-felon registration check here was hardly negligible; indeed, conducting the check effectively *doubled* the length of Evans' detention. Furthermore, the ex-felon registration check in no way advanced officer safety. Zirkle only conducted the ex-felon check *after* he had told Evans that he would not be cited for the traffic violation. The check

---

[7] Even before *Rodriguez*, courts observed that extending traffic stops to perform criminal history checks may be unlawful. In *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003), for example, the officer did not request a criminal history check "until several minutes after he had written the warning [for a traffic violation]." *Boyce* held that "the criminal history check could not be part of the original traffic stop investigation and could not be the basis for prolonging Boyce's detention." *Id.* The "traffic violation investigation was complete" *before* the officer ran the criminal history check, and, therefore, the defendant "was free to go" unless the officer had independent reasonable suspicion of other criminal activity. *Id.*; *see also United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) (rejecting a "bright line rule" permitting a criminal history check as a "constitutional part of all or most traffic stops . . . because often criminal history checks take longer to process than the usual license and warrant requests, and after a certain point meaningful additional time could . . . constitute an unreasonable detention of the average traveller").

thus was inversely related to officer safety; that is, Zirkle would have been safer had he let Evans go once he determined there was no reason to cite him. "[S]afety precautions taken in order to facilitate" investigation of other crimes, *Rodriguez* held, do not relate to an officer's traffic mission. *Id.* Such unrelated "precautions," which do not "stem[] from the mission of the stop itself," therefore cannot justify extending a traffic stop. *Id.*[8]

## B.

*Rodriguez* squarely controls this case in another respect as well. A "dog sniff," *Rodriguez* explained, "is not fairly characterized as part of the officer's traffic mission." *Id.* at 1615. Consequently, a dog sniff that "'prolong[s] [the stop] beyond the time reasonably required to complete th[e] mission' of issuing a ticket for" the traffic offense, "violates the Constitution's shield against unreasonable seizures" unless the officer had independent reasonable suspicion to support such a prolongation. *Id.* at 1612 (third alteration in original) (quoting *Caballes*, 543 U.S. at 407).

The dog sniff *Rodriguez* held unconstitutional was essentially identical to the one conducted in this case. As did the officer in *Rodriguez*, Zirkle stopped Evans for a routine traffic violation and conducted several traffic-related

---

[8] In his motion to suppress, Evans argued that Zirkle "exceeded the purpose of the [traffic] stop by . . . continuing to detain [] Evans to run his criminal history and then to see if he was registered to his current address." The district court did not specifically address this prolongation, however, as it resolved the motion on other grounds. On remand, the district court may consider whether Zirkle had independent reasonable suspicion that Evans was an unregistered felon, so as to permit the extension of the stop to conduct the ex-felon registration check.

inquiries.   Once he received the results of the ex-felon registration check, Zirkle gave Evans a warning, shook Evans' hand, returned his license and paperwork, and informed him that "you're good to go."   As in *Rodriguez*, once the warning was issued, Zirkle's "mission . . . to address the traffic violation that warranted the stop, and attend to related safety concerns" was complete.   *Id.* at 1614 (citation and internal quotation marks omitted).   Yet, Zirkle then re-initiated questioning, asking Evans whether contraband was present in the vehicle.   When Evans refused to provide consent to a search, Zirkle, again as in *Rodriguez*, told Evans to wait outside his car until the officers conducted a dog sniff.

"[T]he Government's endeavor to detect crime in general or drug trafficking in particular," *Rodriguez* held, cannot justify prolonging an ordinary traffic stop to conduct a canine narcotics investigation.   *Id.* at 1616.   Such "[o]n-scene investigation into other crimes . . . detours" from an officer's traffic mission.   *Id.*   Like the ex-felon registration check, the dog sniff was, under *Rodriguez*, a task "aimed at detect[ing] evidence of ordinary criminal wrongdoing," rather than an "ordinary inquir[y] incident to [the traffic] stop."   *Id.* at 1615 (first and third alterations in original) (internal quotation marks omitted).   Prolonging the traffic stop to perform this task, without independent reasonable suspicion, was therefore unlawful.

IV.

We recognize that an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion.   *See id.* at 1615; *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007).   Reasonable suspicion "exists when an officer is aware of specific, articulable facts which,

when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). "We review reasonable suspicion determinations de novo, reviewing findings of historical fact for clear error and giving 'due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1077 (9th Cir. 2013) (en banc) (quoting *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc)).

Here, the government argues that, in the course of the traffic stop, Zirkle developed reasonable suspicion that the car contained contraband. In particular, it points to the odor of methamphetamine, McConnell's nervousness, Evans' changing story about his travels and prior convictions, and the information Beard supplied to Zirkle. Evans disputes whether these facts are supported by the record, and contends that, even if so, they are insufficient to establish reasonable suspicion as to the contraband. Evans also argues that, in any event, there was no reasonable suspicion to justify the eight minute delay for the ex-felon registration check.

In granting Evans' motion to suppress, the district court did not make the "findings of historical fact" and the "inferences drawn from those facts" critical to resolving the parties' dispute concerning reasonable suspicion. *Id.* Whether Zirke possessed independent reasonable suspicion to prolong the detention depends in part on whether the district court finds the officers' testimony concerning the relevant facts credible, and in part on whether the information the officers had provided reasonable suspicion justifying the dual delay. We therefore remand to the district court for consideration in the first instance of whether Zirkle's

prolongation of the traffic stop was supported by independent reasonable suspicion.

**VACATED AND REMANDED.**