**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

HECTOR MAGALLON-LOPEZ,
*Defendant-Appellant*.

No. 14-30249

D.C. No.
1:13-cr-00090-SPW-2

OPINION

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted
November 3, 2015—Portland, Oregon

Filed March 31, 2016

Before: Raymond C. Fisher, Marsha S. Berzon,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford;
Concurrence by Judge Berzon

**SUMMARY**[*]

**Criminal Law**

The panel affirmed the district court's denial of a motion to suppress drugs found in a car that officers stopped and seized based on information learned through wiretap intercepts while investigating an interstate drug-trafficking ring.

The defendant, who did not and could not seriously contest the existence of reasonable suspicion for stopping the car, contended that the stop violated the Fourth Amendment because the officer who pulled him over deliberately lied when stating the reason for the stop, and the reason the officer gave was not itself supported by reasonable suspicion. Rejecting this contention, the panel wrote that so long as the facts known to the officer establish reasonable suspicion to justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion. The panel concluded that in light of the information obtained during the stop, the officers had probable cause to seize the car.

Judge Berzon concurred because the line of cases that begins with *Whren v. United States*, 517 U.S. 806 (1996), seems to lead ineluctably to the conclusion that it is fine for police officers to tell drivers that they observed—or thought they observed—a traffic violation when they did not. Noting that the defendant did not make the argument here, Judge

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Berzon would not foreclose holding, in another case, that there is a due process based right to be informed of the true basis for a stop or arrest.

## COUNSEL

Michael J. Donahoe (argued) and Mark S. Werner, Assistant Federal Public Defenders, Federal Defenders of Montana, Billings, Montana, for Defendant-Appellant.

Michael W. Cotter, United States Attorney, Brendan P. McCarthy (argued), Assistant United States Attorney, United States Attorney's Office for the District of Montana, Billings, Montana, for Plaintiff-Appellee.

## OPINION

WATFORD, Circuit Judge:

Officers investigating an interstate drug-trafficking ring learned through wiretap intercepts that a shipment of methamphetamine would be traveling by car from Washington to Minnesota. They stopped the car en route in Montana; the car belonged to appellant Hector Magallon-Lopez, who was driving. Officers seized the car and, after obtaining a search warrant, discovered approximately two pounds of methamphetamine hidden in an area beneath the trunk. That discovery formed the basis for Magallon-Lopez's drug-trafficking convictions following a jury trial. On appeal, he challenges only the district court's denial of his motion to suppress the drugs found in his car.

I

The relevant facts are not in dispute. Officers working with a Drug Enforcement Administration task force obtained authorization to wiretap a suspected drug trafficker's telephone. From the wiretap intercepts, the officers learned that: (1) on September 27, 2012, a man named Juan Sanchez would be transporting methamphetamine from the Yakima Valley in Washington to Minneapolis, Minnesota; (2) Sanchez would be accompanied by another Hispanic male who had a tattoo on his arm of a ghost, skull, or something else related to death and went by the nickname "Chaparro" (meaning short); and (3) the two men would be traveling in a green, black, or white passenger car with Washington plates. Based on cell site location information obtained from Sanchez's cell phone, the officers estimated that the car would be traveling through Bozeman, Montana, sometime between 3:00 a.m. and 4:00 a.m. on September 28.

The officers set up a surveillance operation near Bozeman on Interstate 90, the main east-west highway through Montana. Around 3:00 a.m. on September 28, they spotted a green Volkswagen Passat with Washington plates traveling eastbound. An officer dispatched to follow the car confirmed that two men were inside and that both appeared to be Hispanic and short in stature. The officer relayed the car's license plate number to another officer, who determined that the car was registered to a man named Hector Lopez at an address in Toppenish, Washington, a town in the Yakima Valley associated with the investigation.

After obtaining this information, the officers decided to conduct an investigatory stop. The officer following the car pulled it over as if making a routine traffic stop. Although

the officer had not observed any traffic violations, he told Magallon-Lopez that the reason for the stop was Magallon-Lopez's failure to signal properly before changing lanes. The officer knew this was not the real reason for the stop, but he did not want to disclose at that point the true nature of the investigation.

Officers questioned both occupants of the car. They asked for identification and confirmed that the passenger was a man named Juan Sanchez. They also confirmed that the driver was Magallon-Lopez, the registered owner of the car. After asking Magallon-Lopez to pull up his sleeves, the officers observed a tattoo of a ghost or grim reaper on his right forearm. Both Magallon-Lopez and Sanchez said they were traveling from the Yakima Valley to Minnesota to work in a restaurant.

While Magallon-Lopez and Sanchez were detained on the side of the highway, the officers summoned a drug-detection dog from a nearby sheriff's office. The dog positively alerted to the presence of drugs in the car. At that point the officers seized the car and took it to the sheriff's office for safekeeping while they obtained a search warrant. The validity of the warrant is not at issue, other than the lawfulness of the stop and subsequent seizure of the car that led to its issuance.

II

The first question is whether the officers lawfully stopped the car. The Fourth Amendment permits investigatory stops if the facts known to the officers established "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal

quotation marks omitted). Magallon-Lopez does not seriously contest the existence of reasonable suspicion, nor could he.

Based on the wiretap intercepts, the officers knew (or at least had probable cause to believe) that Juan Sanchez would be leaving the Yakima Valley on September 27 and traveling by car to Minneapolis with a shipment of methamphetamine. The officers' information about this trip—including the identifying details of the car and Sanchez's traveling companion—came not from an anonymous tip but straight from the conspirators themselves. Officers overheard members of the conspiracy discussing details of the planned trip in real time, during conversations that the conspirators did not know were being intercepted by law enforcement. That information, like information received from a victim or citizen witness, is presumptively reliable absent circumstances suggesting that the conspirators might be lying. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1224–25 (9th Cir. 2009); 2 Wayne R. LaFave, *Search and Seizure* § 3.4(a), at 274–75 (5th ed. 2012). Here, there were no such circumstances. The officers therefore had probable cause to believe that methamphetamine would be found in the car transporting Juan Sanchez through Bozeman on the date and during the time frame in question. To justify stopping a particular vehicle, however, the officers needed reasonable suspicion to believe they had identified the right car.

The details that the officers confirmed before making the stop sufficed to establish reasonable suspicion. Green, black, or white passenger car with Washington plates? Check. Traveling eastbound through Bozeman, Montana, on the correct date and during the predicted, quite narrow time frame? Check. Occupied by two Hispanic males? Check.

Registered to an owner who lived in a town associated with the investigation and who, at least in terms of stature, fit the description of the person expected to be accompanying Sanchez? Double check. Verification of these details, taken together, established reasonable suspicion to believe that the green Passat was the car transporting Juan Sanchez as discussed in the wiretap intercepts.

Unable to contest the existence of reasonable suspicion, Magallon-Lopez challenges the legality of the stop on a different theory. He contends that the stop violated the Fourth Amendment because the officer who pulled him over deliberately lied when stating the reason for the stop, and the reason the officer gave was not itself supported by reasonable suspicion.

That the officer lied about seeing Magallon-Lopez make an illegal lane change does not call into question the legality of the stop. The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop. If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense. *Whren v. United States*, 517 U.S. 806, 812–13 (1996). Likewise, if the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as the basis for the arrest, a different offense as to which probable cause was lacking. *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004); *United States v. Ramirez*, 473 F.3d 1026, 1030–31 & n.2 (9th Cir. 2007). The Court in *Devenpeck* emphasized that the objective facts are what matter in situations like these:

> While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required. Hence, the predictable consequence of a rule limiting the probable-cause inquiry to offenses closely related to (and supported by the same facts as) those identified by the arresting officer is not . . . that officers will cease making sham arrests on the hope that such arrests will later be validated, but rather that officers will cease providing reasons for arrest. And even if this option were to be foreclosed by adoption of a statutory or constitutional requirement, officers would simply give every reason for which probable cause could conceivably exist.

543 U.S. at 155 (footnote omitted).

The same principle—that the objective facts are controlling in this context, not what the officer said or was thinking—applies here. So long as the facts known to the officer establish reasonable suspicion to justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion. We emphasize, however, that although our focus is on the objectively reasonable basis for the stop, not the officers' subjective intentions or beliefs, the facts justifying the stop must be known to officers at the time of the stop. *See Moreno v. Baca*, 431 F.3d 633, 639–40 (9th Cir. 2005).

The only remaining question is whether, in light of the information obtained during the stop, the officers had probable cause to seize Magallon-Lopez's car. We think they did. As discussed above, given the reliability of the information gleaned from the wiretap intercepts, the officers had probable cause to believe that Juan Sanchez would be transporting methamphetamine by car on the date and during the time frame in question. That, in turn, gave the officers probable cause to believe that methamphetamine would be found inside the car in which Sanchez was riding, assuming they could identify the correct car.

As we have said, even before the officers stopped Magallon-Lopez's car, the facts known to the officers provided reasonable suspicion to believe they had identified the correct car. The investigatory stop eliminated virtually any doubt on that score, as the stop confirmed that a man named Juan Sanchez was indeed a passenger in the car. Sure, he could have been a different Juan Sanchez, not the one mentioned in the wiretap intercepts, but the likelihood of that was minuscule given all the other details that matched, including the tattoo on Magallon-Lopez's arm and the fact that both he and Sanchez admitted they were traveling to Minnesota. In light of these and the other details the officers were able to corroborate, there was "a fair probability" that the officers had stopped the right car and that drugs would be found inside. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). That gave them probable cause to seize the car.

Because the officers had probable cause to seize the car even without the drug-detection dog's positive alert, we need not address Magallon-Lopez's argument that the dog's lapsed certification rendered his alert insufficiently reliable under *Florida v. Harris*, 133 S. Ct. 1050 (2013).

*          *          *

The district court correctly denied Magallon-Lopez's motion to suppress. The judgment is **AFFIRMED**.

---

BERZON, Circuit Judge, concurring:

Is it fine for police officers flatly to tell the drivers they stop that they observed—or thought they observed—a traffic violation when they really did not? We hold today that it is. And I cannot disagree, as the line of cases that begins with *Whren v. United States*, 517 U.S. 806 (1996), seems to lead ineluctably to that distressing conclusion. But lying to government officials can lead to lengthy prison terms. *See* U.S.S.G. § 2J1.3(a) (providing a base offense level of fourteen for perjury-type offenses, which, at criminal history category I, results in a recommended sentence of fifteen to twenty-one months). One would expect that lying by police officers to citizens would have consequences as well.

*Whren* and the other cases the majority cites do not deal directly with flat out lies about what police officers saw. Instead, *Whren* dealt with pretextual stops—that is, instances in which the officers did perceive actions that violated the traffic laws, but were really using the traffic violations as a basis for investigating some other crime. Perhaps there was no reasonable suspicion as to the real reason for the stop, just a hunch. Or perhaps the officers did not want to reveal the real reason for the stop, as the underlying criminal investigation was still ongoing. *United States v. Evans* noted that law enforcement terms this type of stop a "wall stop"—that is, "the traffic stop [i]s to be independent and

clear from the [ongoing] investigation to protect [law enforcement's] information and the data and identities of the sources of information." 786 F.3d 779, 781 n.2 (9th Cir. 2015) (alterations omitted). In either instance, police officers are usually confident that they can "develop . . . probable cause" of a traffic violation. *Id.* at 781. The traffic laws are sufficiently comprehensive, as well as general, that almost all drivers violate at least one whenever they are on the road. *See Whren*, 517 U.S. at 810 (noting the defendants' argument to this effect).

But what if the driver is *very* careful not to break any laws, as one might be if carrying a cargo of illegal drugs? And what if the police officers are intent nonetheless on catching their targets, without revealing that they are pretty sure what is in the car? Here, the law enforcement solution was to flat out lie. Not just about *why* the car was being stopped (as in *Whren* and its progeny), but also about what they had seen—the purported traffic violation.

As I read *Whren*, 517 U.S. 806, and *Devenpeck v. Alford*, 543 U.S. 146 (2004), there is no plausible argument for treating this sort of lie differently from the lie involved in *Whren*—as to why the officer is actually stopping the suspect—or the misstatement in *Devenpeck*—as to the offense as to which the officer had probable cause for an arrest. In both instances, the Supreme Court found no Fourth Amendment violation as long as there was indeed a proper basis for the stop or arrest on the facts known to the officers. As a result, the suspect in both instances had no useful opportunity verbally to explain why he should not be cited or arrested, as the purported basis for the police action was not binding on law enforcement anyway. That any such explanation would have been similarly futile here, this time

because the police were lying about what they saw, does not distinguish *Whren* and *Devenpeck*.

The upshot is that approving the practice used in this case is the inevitable result of the *Whren*/*Devenpeck* line of cases. But as countless commentators have warned, *Whren* and related cases "hint[] to law enforcement that it can escape the Fourth Amendment's restrictions if it offers phony explanations for [its] actions." Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1904 (Aug. 2004). The *Whren*-type precedents are especially troubling in that they enable artifice and abuse by law enforcement, with disproportionate effect on racial minorities; "[i]ndeed, as the recent debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual." *Atwater v. City of Lago Vista*, 532 U.S. 318, 372 (2001) (O'Connor, J., dissenting). At least in part because of these considerations, I would not foreclose, in another case, holding that there is a due process (not Fourth Amendment) based right to be informed of the true basis for a stop or arrest. *Devenpeck*, I note, left open that possibility. *See* 543 U.S. at 151, 155. But no such argument was made here.

Many states find the officers' conduct here concerning, for the same reasons I do. For that reason, many jurisdictions require law enforcement officers to inform detainees of the reasons for custodial arrests, and some hold them responsible for misstatements. While Magallon-Lopez does not argue in this case for a constitutionally-based requirement that police officers identify some basis for a stop or arrest, it *is* good police practice to inform a detainee of the basis of a

detention, as *Devenpeck* acknowledges. *See* 543 U.S. at 155. The non-exhaustive list of states that have adopted such a requirement includes New York, California, Massachusetts, and North Carolina, all of which have enacted statutes to this effect. *See* N.Y. Crim. Proc. Law § 140.15(2); Cal. Penal Code § 841; Mass. Gen. Laws ch. 263 § 1; N.C. Gen. Stat. § 15A-401(c)(2)c. The Massachusetts statute—perhaps to impose the same standard of truthfulness on both law enforcement and everyday citizens—specifically requires that an officer's statement be true, and punishes an officer's false statement by a fine of up to $1,000 and/or imprisonment for up to one year. Mass. Gen. Laws ch. 263 § 1. Georgia's courts have also established, by precedent, the requirement that an officer inform an arrestee of the cause of his or her arrest. *See Dorsey v. State*, 66 S.E. 1096, 1097–98 (Ga. Ct. App. 1910); *see also Bashir v. Rockdale Cnty.*, 445 F.3d 1323 (11th Cir. 2006) (reversing summary judgment for officers on the plaintiff's state-law unlawful arrest claim because the officers did not inform the plaintiff of the crime for which he was arrested).

Most relevant here—as Magallon-Lopez was stopped in Montana by a Montana officer—Montana requires an arresting officer to "inform the person to be arrested of the officer's authority, of the intention to arrest that person, *and of the cause of the arrest*." Mont. Code Ann. § 46-6-312 (emphasis added). Magallon-Lopez has not asserted that his arrest was unlawful under this provision, and Montana's courts have not extended the statute, applicable only to "arrests," to *Terry*-type stops premised on reasonable suspicion, as occurred here. Nonetheless, that Montana and other states have such laws in place may guard against the frequent use of stops similar to the one here.