NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

APR 15 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MANUEL PAZ SANCHEZ, JR.,

Defendant-Appellant.

No. 19-30248

D.C. No. 18-cr-00003-SPW

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Submitted September 2, 2020[**]
Seattle, Washington

Before: BYBEE and COLLINS, Circuit Judges, and STEARNS,[***] District Judge.

Defendant-Appellant Manuel Paz Sanchez, Jr. ("Sanchez") appeals his

conviction after he entered a conditional plea of guilty reserving his right to appeal

the district court's order denying his motion to suppress. *See* FED. R. CRIM. P.

11(a)(2). Reviewing the denial of that motion de novo, *United States v. Patayan

Soriano*, 361 F.3d 494, 501 (9th Cir. 2004), we affirm.

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

[**] The panel unanimously concludes that this case is suitable for decision without
oral argument. *See* FED. R. APP. P. 34(a)(2)(C).

[***] The Honorable Richard G. Stearns, United States District Judge for the District
of Massachusetts, sitting by designation.

1.  On December 12, 2017, Montana Highway Patrol Trooper Barry Kilpela, a narcotics K-9 officer, observed a car following closely behind a semi-tractor-trailer in the eastbound lanes of Interstate 90.  Based on this apparent violation of Montana Code Annotated § 61-8-329, Kilpela pulled over the car.[1]  Sanchez was the driver and sole occupant.  Kilpela explained the reason for the stop, and Sanchez acknowledged that he had followed the semi too closely.  Kilpela asked why he had not simply passed the semi, and Sanchez said that he had seen Kilpela's patrol car and did not want him to think that Sanchez was trying to avoid him.  Kilpela asked to see the vehicle's registration, and Sanchez handed him the rental contract for the car.  Kilpela saw that the contract said that the car had been rented three days earlier in Sacramento, California, and that the car was a day overdue.  Kilepela asked Sanchez if he would sit with him in the front seat of his patrol vehicle while Kilpela filled out a warning for following too closely, and Sanchez agreed.

While filling out the warning, Kilpela asked Sanchez where he was coming from and Sanchez started to say "Oklahoma," but then said he was coming from Idaho.  Sanchez stated that he lived in Sacramento and that he rented the car to go

---

[1] Under Montana law, "[t]he driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the roadway." MONT. CODE ANN. § 61-8-329(1).

visit family in Kuna, Idaho, for several days and then went to Yellowstone National Park. Sanchez claimed that he was headed towards North Dakota "to catch a flight back to Sacramento." When asked what city his flight was departing from, Sanchez had to check his phone and then responded that it was Bismarck. Sanchez explained that he was flying back to California, rather than driving, because he was in a hurry to get home. Sanchez also stated, however, that he was running late for his flight and that he might have to rebook it. Kilpela said he was confused by this story, given that it seemed odd to drive all the way from Idaho to North Dakota in order to take a flight back to California. Kilpela knew that the drive back to California from Idaho would take no longer than the drive to Bismarck, and possibly much shorter. Sanchez acknowledged that his story seemed confusing, but he provided no further explanation.

Two other officers, Agent Richard Smith and Sergeant Troy Muri, arrived together around this time. They were part of a three-person team with Kilpela and they headed over to the area of the traffic stop after hearing Kilpela call in a request on the radio for a criminal records check on Sanchez (which came back negative). Muri initially stayed in his patrol car while Smith went up to Kilpela's vehicle. Smith spoke with Sanchez while Kilpela went back to the rental car to check the Vehicle Identification Number ("VIN"). After verifying the VIN, Kilpela returned to his patrol car, completed the warning form, and gave it to

Sanchez, together with his license and the rental contract. At that point, Kilpela asked Sanchez whether he had any weapons, drugs, or large amounts of cash in the car. Sanchez said that he did not. Kilpela then asked Sanchez for his consent to search the rental car. Sanchez consented verbally and in writing.

While Kilpela initially stayed with Sanchez, Smith and Muri began the search of the rental car. Smith began to search the front seat and console area, and Muri examined the trunk and took out the spare tire. Upon joining the other officers and inspecting the tire, Kilpela thought that it was unusually heavy and that it did not bounce on the ground the way he thought it should. Kilpela then asked Sanchez if he could cut the tire open, and Sanchez responded, "it's not mine, it's the rental company's." Rather than cut the tire, Kilpela instead got his narcotics detector dog from his patrol car, and the dog alerted to the spare tire. He also performed an "echo" test in which he placed a stethoscope against the tire and hit the tire with a mallet to see if any obstruction in the tire would deaden the echo that would normally occur. The echo test produced a "heavy thud," rather than an echo, and Kilpela concluded that there was an obstruction in the tire. Smith asked Sanchez if they could take the car to a nearby tire shop so that they could take the tire off its rim and look inside, and Sanchez consented. Smith then drove the rental car, with the spare tire in it, to the tire shop. Muri, who had handcuffed Sanchez and put in him the back seat of his patrol car, followed Smith, as did Kilpela in his

4

patrol car. After the tire was removed from the wheel, Smith and Kilpela found six sealed packages that collectively contained over eight pounds of methamphetamine. Muri then took Sanchez to the sheriff's station for booking.

Sanchez was indicted for a single count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). After the district court denied his motion to suppress, he conditionally pleaded guilty and was sentenced to 188 months. Sanchez timely appealed.

2. Sanchez does not contest that, at the time Kilpela pulled him over, Kilpela had the necessary "reasonable suspicion" that Sanchez had committed an offense, namely, that Sanchez had followed another vehicle too closely in violation of Montana Code Annotated § 61-8-329. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Rather, Sanchez contends that his traffic stop was prolonged beyond what was necessary to complete the ordinary inquiries associated with that traffic stop and that, as a result, the extent of the seizure was unreasonable under the Fourth Amendment.

Once a driver such as Sanchez has been stopped, the "tolerable duration" of the resulting roadside detention "is determined by the seizure's 'mission,'" which is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's

5

mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355 (simplified). Moreover, an officer "may conduct certain unrelated checks," but he or she "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. The authority for the continuing "seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 354.

Here, Sanchez does not contend that Kilpela took too long in performing the basic inquiries associated with the traffic stop, such as checking his license and car registration, running a check for outstanding warrants, and preparing the written warning. Nor does Sanchez contend that Kilpela's questioning of him while Kilpela conducted these tasks impermissibly prolonged the stop. Instead, Sanchez argues that, once these tasks were completed, and Kilpela handed the warning and other documents to Sanchez, the mission of the stop was fulfilled and the detention should immediately have ceased. Sanchez acknowledges that the stop could properly be prolonged if, in the course of conducting these "ordinary inquiries," Kilpela developed reasonable suspicion of an *additional* offense. *Rodriguez*, 575 U.S. at 355. Sanchez contends, however, that Kilpela lacked such reasonable

6

suspicion and therefore lacked the authority to continue the detention and ask for consent to search the vehicle. We disagree.

The information that Kilpela developed during the ordinary incidents of the traffic stop was more than sufficient to provide reasonable suspicion that Sanchez was involved in drug trafficking. Although the rental car was overdue no matter what Sanchez's purpose was, his claimed itinerary—several days with family in Idaho followed by a trip to Yellowstone—was hard to square with the fact that he had only rented the car for two days in the first place. Moreover, Sanchez's story that he was headed east all the way to Bismarck in order to fly west back to Sacramento made little sense. And Sanchez's initial confusion about what State he had departed from (Oklahoma versus Idaho), and his need to consult his cell phone to say where he was headed to in North Dakota, strongly suggested that he was making up the details of his story on the fly. Collectively, these facts created a reasonable suspicion that Sanchez was involved in illegal activity, most likely the possession of narcotics or other contraband. Accordingly, the "period of detention was permissibly extended because new grounds for suspicion of criminal activity continued to unfold." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005); *see also United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) ("We recognize that an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion.").

7

3. Sanchez also asserts that the officers' search of the rental car's spare tire exceeded the scope of Sanchez's consent to search the car. We reject this contention.

The "standard for measuring the scope of a suspect's consent [to a search] under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also United States v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir. 1992). Here, a reasonable person would have understood the spare tire to be included within the scope of Sanchez's verbal and written consent to search the rental car.

Sanchez knew that the officers were interested in whether the car contained drugs or weapons, and Sanchez's written consent expressly extended to all "items of property whatsoever which they deem pertinent to their investigation." *See Gutierrez-Mederos*, 965 F.2d at 803–04 (holding that, because "[t]he scope of a search generally is defined by its expressed object," a consent to search a car for contraband presumptively "authorized the trooper to search any container within the car that reasonably could contain contraband"). The written form explicitly informed Sanchez that he had the right to refuse the search and to stop it at any time. However, at no point did Sanchez object to the officers' examination of the tire or place any limitation on their search. *See United States v. Cannon*, 29 F.3d

8

472, 477 (9th Cir. 1994) ("Failure to object to the continuation of a vehicle search after giving general consent to search 'is properly considered as an indication that the search was within the scope of the initial consent.'" (citation omitted)).

Sanchez notes that, when Kilpela asked for express consent to cut the spare tire, Sanchez did not say "yes," but instead said "it's not my tire." But a reasonable person would not construe that as a withdrawal of, or limitation on, Sanchez's consent to search the car. On the contrary, his disavowal of any ownership of, or interest in, the rental car's spare tire would reasonably be understood as greenlighting the search of the tire, even to the point of cutting it. *Cf. United States v. Brown*, 884 F.2d 1309, 1312 (9th Cir. 1989) (noting that a suspect's "reluctance" to a search of his luggage "was not enough to indicate he had withdrawn his unambiguous statement of consent"). Because a reasonable person would have understood that Sanchez's consent extended to the tire and was never withdrawn, the officers did not act unreasonably in searching the spare tire.[2]

**AFFIRMED**.

---

[2] Sanchez does not challenge the precise manner in which the officers searched the tire, which involved transporting it (and apparently him) to a nearby tire shop. On the contrary, he concedes that he consented to that procedure and he contends only that it was tainted by the officers' earlier assertedly unconstitutional search of the tire.