No. 117,571

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS, ex rel.,
GEARY COUNTY SHERIFF'S DEPARTMENT,
*Appellant*,

v.

ONE 2008 TOYOTA TUNDRA, VIN: 5TBBV54158S517709;
$84,820.00 IN U.S. CURRENCY, MORE OR LESS;
and
APPROXIMATELY 11.9 GRAMS OF MARIJUANA,
*Defendants*,

and

RYAN P. BOYLE,
*Appellee.*

SYLLABUS BY THE COURT

1.

Although forfeiture actions are civil in nature, the protections against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights are applicable. Therefore, the constitutional exclusionary rule applies to forfeiture proceedings.

2.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Section 15 of the Kansas Constitution Bill of Rights provides the same protection from unlawful government searches and seizures as the Fourth Amendment.

1

3.

A traffic stop is a seizure under the Fourth Amendment to the United States Constitution. For the traffic stop to be constitutionally reasonable, the officer must know of specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction.

4.

A traffic stop seizure that is justified at its inception can become illegal if the officer unreasonably prolongs the duration of the stop beyond its mission. While law enforcement does not extend the duration of a stop by asking questions related to its purpose, questions unrelated to the purpose of the stop are permitted so long as an officer's inquiries into matters unrelated to the justification for the traffic stop do not measurably extend the duration of the stop.

5.

A routine traffic stop is a relatively brief encounter, and the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

6.

On-scene investigation into other crimes detours from the mission of the traffic stop. So too do safety precautions taken in order to facilitate such detours. While an officer may conduct certain investigations unrelated to the traffic violation, the officer may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

2

7.

The time permitted to complete the mission or investigation of a traffic violation includes precautions taken to promote officer safety and ordinary inquiries incident to the traffic stop. Ordinary inquiries incident to a traffic stop expressly and typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

8.

Because traffic stops are especially fraught with danger to police officers, the time needed to complete the mission of investigating the traffic infraction may require an officer to take certain negligibly burdensome precautions in order to complete his or her mission safely. Given this danger, detaining a motorist for a short period so that law enforcement may check for any outstanding warrants or criminal history, even though the purpose of the stop had nothing to do with such prior criminal history, may be justified for officer safety.

9.

Under the facts of this case, the officer's request of dispatch to conduct a criminal history check of the driver unreasonably prolonged the stop as the tasks associated with the stop had been completed at the time of the request. Moreover, any safety concerns associated with the stop no longer existed at the time the officer's request was made.

Appeal from Geary District Court; BENJAMIN J. SEXTON, judge. Opinion filed February 23, 2018. Affirmed.

*Colin Wood*, special prosecutor, for appellant.

*Jeremiah L. Platt*, of Clark & Platt, Chtd., of Manhattan, for appellee.

Before POWELL, P.J., STANDRIDGE, J., and STUTZMAN, S.J.

POWELL, J.: A sergeant in the Geary County Sheriff's Department stopped a 2008 Toyota Tundra driven by Jordan Stephens, with Ryan Boyle as a passenger, on Interstate 70 because the license plate on the vehicle was partially obstructed. During the stop, the sergeant's K-9 conducted a dog sniff of the pickup truck and alerted to the presence of drugs. Ultimately, the truck, a large amount of currency, and nearly 12 grams of marijuana were seized. The State of Kansas brought a civil forfeiture action against the seized property, but the district court granted Boyle's motion to suppress this evidence after finding that the sergeant unreasonably prolonged the stop beyond its original purpose by requesting a criminal history check on Stephens, thus giving the sergeant's K-9 time to perform the dog sniff. The State now appeals the district court's granting of the suppression motion. Because we agree with the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2016, the State of Kansas on behalf of the Geary County Sheriff's Department commenced a civil asset forfeiture action for property allegedly seized in violation of the Uniform Controlled Substances Act pursuant to K.S.A. 60-4101 et seq. The property subject to forfeiture includes a 2008 Toyota Tundra pickup truck, $84,820 in U.S. currency, and approximately 11.9 grams of marijuana. The petition for forfeiture filed in June 2016 gave notice to two parties whom the State asserted may have an ownership interest in the property: Jordan Stephens and Ryan Boyle.

Three weeks later, Boyle filed an answer to the State's forfeiture petition claiming an ownership interest in the seized truck and the $84,820. In relevant part, Boyle claimed the property was exempt and not subject to forfeiture because it was unconstitutionally seized in violation of his rights under the Fourth Amendment to the United States Constitution. Subsequently, Boyle filed a motion to suppress, arguing that Geary County

Sheriff's Sergeant Christopher Ricard impermissibly extended the duration of the traffic stop for an obstructed license plate by ordering a criminal history check on Stephens, after Ricard's in-car computer check confirmed that Stephens had a valid driver's license, that he was not wanted and had no warrants against him, and that the truck was properly insured and registered. The State argued that Ricard did not impermissibly extend the traffic stop because he requested the criminal history check on Stephens while he was still conducting his investigation of the traffic infraction.

At the hearing on Boyle's motion to suppress, Ricard testified that on March 7, 2016, he was working as a K-9 patrol officer for the Geary County Sheriff's Department. He stated that he and his dog Scooby had to undergo special training and certification for this position. Ricard pulled over a Toyota Tundra pickup truck heading westbound on Interstate 70 for an obstructed registration or license plate. He explained that the state name on the Ohio license plate was blocked. After Ricard activated his lights, the truck came to a complete stop near mile marker 303 about one minute and nine seconds (1:09) later without incident.

Parenthetically, we note that Ricard's testimony at the motion to suppress hearing references a time clock from a video recording of the traffic stop that is not included in the record on appeal. The minute references refer to that video time clock. The video time clock is ahead of the actual stop length by about 1:09—based on when Ricard activated his lights.

Ricard testified that he approached the vehicle from the passenger's side, informed Stephens of his reason for stopping the truck, and requested his driver's license and insurance information. After searching for his driver's license for a couple of seconds, Stephens asked Ricard if he could look for it in the backseat of the truck. Ricard permitted Stephens to exit the truck, walk around him, and search for his driver's license. Ricard stated at the hearing that he did not pat down Stephens because he was not in fear

of his safety. While Stephens searched for his license, Ricard asked Boyle about their travel plans. Boyle told Ricard that they planned to spend about one week in Las Vegas, Nevada. About 2:37 into the video of the stop, Stephens found his driver's license and agreed to accompany Ricard to his patrol car. At that time, Ricard told Stephens that if everything checked out, he would issue a warning ticket.

Ricard testified that he started to suspect criminal activity was afoot—other than the traffic violation—by the time he reentered his patrol car with Stephens. Ricard stated his suspicions were based on Boyle's stated travel plans that the two were heading to Las Vegas from Ohio. Ricard testified that the Sheriff's Department had noticed an increase in drugs moving towards Ohio and that Las Vegas was a known drug source location.

Once inside the patrol car, Ricard entered Stephens' identification and vehicle information into his Mobile Data Terminal, or in-car computer. While waiting for the results, Ricard asked Stephens about his travel plans. Stephens replied that the two planned to stay in Las Vegas for about one week. Shortly after Ricard entered Stephens' information, the computer results showed that Stephens had a valid driver's license, he was not wanted for any crimes, he had no outstanding warrants against him, and the truck was properly registered and insured. At this point, 4:09 had elapsed according to the video of the traffic stop.

About 40 seconds later, Ricard requested from dispatch a check on Stephens' "triple I" or criminal history information, in part because his in-car computer could not retrieve this information. Upon questioning by the district court at the hearing, Ricard testified that he did not request criminal history checks with every traffic infraction but that he did so here because he believed the truck's occupants were involved in criminal activity other than the obstructed license plate.

6

About 5:46 into the video of the stop, Ricard exited his patrol car and approached Boyle, who was still seated in the passenger seat of the truck. Ricard asked Boyle about his travel plans a second time, and Boyle again told him that they were going to stay in Las Vegas for about a week. Ricard then asked Boyle to exit the truck and informed him that he was going to have Scooby sniff around the exterior of the truck. Ricard testified that, at that point, Boyle was not free to leave.

About 7:25 into the video of the stop, Ricard conducted an exterior dog sniff of the truck with Scooby. At the 8:54 mark, what did Scooby do? Scooby indicated the presence of drugs at the truck's rear passenger-side corner of the tailgate area. Ricard subsequently informed Stephens that the dog indicated to the presence of a controlled substance; upon further questioning, Stephens told Ricard that he did not have any illegal substances or large amounts of money in the truck. Ricard then informed Boyle, who was still standing on the side of the road, of the situation. At the 11:01 mark, dispatch attempted to contact Ricard.

The district court granted Boyle's motion to suppress evidence in a written order, ruling that Ricard's request for Stephens' criminal history unreasonably prolonged the duration of the traffic stop. The district court found that the traffic stop for the obstructed license plate was completed 4:09 into the video of the stop or when Ricard knew that Stephens had a valid driver's license, he had no warrants, and the vehicle was properly registered and insured. The district court also found that Ricard did not have reasonable suspicion to prolong the traffic stop since his suspicion was based only on the occupants' travel plans and that he impermissibly prolonged the stop by requesting a check on Stephens' criminal history after the stop's completion. The district court rejected the State's assertion that law enforcement officers have a right to request criminal history information at every traffic stop. Instead, the district court held that the factual circumstances showed that Ricard had no need to request the criminal history check because he did not have concerns for his safety and the stop was not dangerous.

7

After the hearing, the State filed a motion for reconsideration, arguing that a recent decision from this court in *State v. Jimenez*, No. 116,250, 2017 WL 758139 (Kan. App.) (unpublished opinion), *rev. granted* 306 Kan. 1325 (2017), required the district court to reverse its decision. In relevant part, the State argued that *Jimenez* held that performing a criminal history check on a driver during a traffic stop was within the original scope and purpose of every stop, so a criminal history check could not serve as an unreasonable extension of the duration of a traffic stop.

In *Jimenez* the officer requested a check on the driver's and the passenger's identification information, i.e., driver's license, warrant check, and criminal history, from dispatch at the same time; while waiting for dispatch to provide the information from the full records check, the officer conducted the K-9 drug sniff. Unlike in *Jimenez*, the district court here concluded that Ricard had all the information he needed to conclude the original purpose of the traffic stop after he completed his in-car computer check but before he requested Stephens' criminal history. The district court denied the State's motion for reconsideration and determined that *Jimenez* was distinguishable.

The State brings this interlocutory appeal seeking reversal of the district court's suppression of the evidence.

DID THE DISTRICT COURT ERR IN GRANTING THE MOTION TO SUPPRESS?

Before us, the State argues the district court erred in ruling that law enforcement's criminal history check of Stephens unreasonably prolonged the traffic stop absent reasonable suspicion that other criminal activity was afoot.

"When reviewing a motion to suppress evidence, the factual underpinnings of the district court's decision are reviewed for substantial competent evidence and the ultimate legal conclusion is reviewed de novo." *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d

8

512 (2016). "Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion." *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013). An appellate court "normally gives great deference to the factual findings of the district court. The appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in evidence. [Citations omitted.]" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

A.     *The Fourth Amendment Applies to Civil Forfeiture Actions.*

In *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965), the United States Supreme Court held that "the constitutional exclusionary rule does apply to such forfeiture proceedings." Although forfeiture actions are civil in nature, the protections against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights are applicable. *State v. 1990 Lincoln Town Car*, 36 Kan. App. 2d 817, 820, 145 P.3d 921 (2006). While the Kansas Supreme Court has not expressly adopted the *Plymouth Sedan* holding, it has implicitly recognized the exclusionary rule applies in the civil forfeiture context. See *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 641, 176 P.3d 938 (2008) (noting that *Plymouth Sedan* applied exclusionary rule to civil forfeiture actions which are "quasi-criminal in character"), *overruled on other grounds by City of Atwood v. Pianalto*, 301 Kan. 1008, 1011-13, 350 P.3d 1048 (2015).

B.     *Fourth Amendment Searches and Seizures, Generally*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "[Section] 15 of the Kansas Constitution Bill of Rights [provides] the same protection from unlawful government searches and seizures as the Fourth

9

Amendment." *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). The State has the burden of proving the search or seizure was lawful. *Cleverly*, 305 Kan. at 605.

### C.     *Traffic Stop Seizures, Generally*

While the parties do not challenge the validity of the initial traffic stop here, a traffic stop is a seizure under the Fourth Amendment. See *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014); see also *Terry v. Ohio*, 392 U.S. 1, 16-17, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (investigative detention is a type of traffic stop, commonly referred to as a *Terry* stop). For the traffic stop to be "constitutionally reasonable, the officer must know of specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction." *Jones*, 300 Kan. at 637 (citing *State v. Garza*, 295 Kan. 326, 332, 286 P.3d 554 [2012]); *Terry*, 392 U.S. at 21; see also *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed 2d 89 (1996) (justification for stop not based upon subjective motivations of law enforcement).

### 1.     *Duration and Scope of a Traffic Stop Seizure*

A traffic stop seizure that is justified at its inception can become illegal if the law enforcement officer unreasonably prolongs the duration of the stop beyond its mission. See *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). While law enforcement does not extend the duration of a stop by asking questions related to its purpose, questions unrelated to the purpose of the stop are permitted so long as "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

However, the United States Supreme Court recently rejected the government's argument that an officer may prolong a traffic stop to conduct unrelated tasks "so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015). Explained the Court:

> "'[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . than to a formal arrest.' Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. [Citations omitted.]" 135 S. Ct. at 1614.

The Court further emphasized that "[o]n-scene investigation into other crimes . . . detours from [the] mission [of the traffic stop]. So too do safety precautions taken in order to facilitate such detours." 135 S. Ct. at 1616. Instead, the Court agreed that while an officer may conduct certain investigations unrelated to the traffic violation, the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 135 S. Ct. at 1615.

The time permitted to complete the mission or investigation of a traffic violation includes precautions taken to promote officer safety and "'ordinary inquiries incident to [the traffic] stop.'" 135 S. Ct. 1615 (quoting *Caballes*, 543 U.S. at 408). Ordinary inquiries incident to a traffic stop expressly and typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are

11

operated safely and responsibly. [Citations omitted.]" *Rodriguez*, 135 S. Ct. at 1615. A dog sniff is not a routine part of a normal traffic stop. 135 S. Ct. at 1615.

Moreover, because traffic stops are "'especially fraught with danger to police officers[,]'" *Johnson*, 555 U.S. at 330, the time needed to complete the mission of investigating the traffic infraction may require an officer "to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616. Given this danger, detaining a motorist for a short period so that law enforcement may check for any outstanding warrants or criminal history, "even though the purpose of the stop had nothing to do with such prior criminal history," may be justified for officer safety. *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc), *abrogated on other grounds as recognized in United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007); see also *United States v. Cone*, 868 F.3d 1150, 1153 (10th Cir. 2017) (criminal history questions permitted for officer safety).

2.  *Kansas Caselaw Concerning the Duration of a Routine Traffic Stop*

The Kansas Supreme Court has not directly addressed how *Rodriguez* impacts the permissible duration of a routine traffic stop but has held that the permissible duration of the traffic stop includes the time required for the officer to "request the motorist's driver's license, car registration, and proof of insurance; conduct a *computer check*; issue a citation; and take those steps reasonably necessary to protect officer safety. The stop can last only as long as necessary to complete those tasks, and those tasks must be diligently pursued." (Emphasis added.) *State v. Smith*, 286 Kan. 402, 410, 184 P.3d 890 (2008); see *Jones*, 300 Kan. at 640. "[O]nce the officer determines that the driver has a valid license and the purpose for the traffic stop has ended, the driver must be allowed to leave without further delay. *Coleman*, 292 Kan. at 816; *Anderson*, 281 Kan. at 902; *State v. Mitchell*, 265 Kan. 238, 245, 960 P.2d 200 (1998)." *Jones*, 300 Kan. at 640.

12

A panel of this court recently had the opportunity to apply the law on traffic stops after the *Rodriguez* decision in *Jimenez*, 2017 WL 758139. In *Jimenez*, the driver was pulled over for the traffic infraction of following the vehicle in front of her too closely. The officer requested from dispatch a simultaneous record check on the driver's and the passenger's identification information and criminal history. The officer also visited with Jimenez about her travel plans. While waiting on the return from dispatch, the officer had his patrol dog conduct an exterior sniff of the car. The dog alerted to the rear bumper, and large quantities of cash were found. Following a hearing on the motion to suppress, the district court suppressed the evidence from the search of the vehicle, finding that the criminal record checks and the officer's questions relating to travel plans unreasonably prolonged the stop.

On appeal, the panel reversed, holding that "[p]erforming a criminal record check on the driver of an automobile is within the scope of a traffic stop." 2017 WL 758139, at *4. Relying on *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998), the panel reasoned that because a criminal record check is within the purpose of a traffic stop, an officer's inquiry into a driver's criminal history cannot measurably—and impermissibly—extend a traffic stop. 2017 WL 758139, at *4. In *DeMarco,* the driver was pulled over for a failure to signal a lane change. During the stop, the officer requested a simultaneous records check from dispatch on the driver's and the passenger's driver's licenses, outstanding warrants, and criminal history. Under the facts of the case, our Supreme Court stated that a criminal record check on a driver did not extend the duration of the stop and held that the computer check was permissible. 263 Kan. at 734. The panel interpreted *DeMarco* as follows: "The language from *DeMarco* essentially states the police may not measurably extend the stop to investigate matters *unrelated* to a stop; however, *a criminal record check on a driver is within the purpose of a stop*. See 263 Kan. at 734; accord *Johnson*, 555 U.S. at 333." (Emphasis added.) 2017 WL 758139, at *4.

The *Jimenez* panel applied *Rodriguez*' constitutional requirement that "[t]he time "'reasonably required to complete the mission" of issuing a ticket' include[s] the "'ordinary inquiries incident to [the traffic] stop."'" 2017 WL 758139, at *3 (quoting *Rodriguez*, 135 S. Ct. at 1615). In adopting *Rodriguez*' "limited, but not all inclusive, list" of ordinary inquiries incident to a traffic stop—which expressly includes "'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance[,]'"—the *Jimenez* panel implicitly placed the criminal record check into the ordinary inquiries incident to the traffic stop category. 2017 WL 758139, at *3-5 (quoting *Rodriguez*, 135 S. Ct. at 1615).

The State asks us to find *Jimenez* controlling—that a criminal record or history check is always a permissible part of a routine traffic stop as an ordinary inquiry incident to the stop because of the safety hazards faced by law enforcement at every traffic stop. However, we are not bound by a decision of another panel of our court. *State v. Fahnert*, 54 Kan. App. 2d 45, 56, 396 P.3d 723 (2017).

Here, the district court found *Jimenez* distinguishable from the facts of this case in ruling against the State's motion for reconsideration. Specifically, the district court noted that in *Jimenez* the officer used dispatch to conduct all the records checks at the same time. Here, Ricard used his in-car computer to complete most of the records checks and then contacted dispatch to conduct the criminal history check.

Like the district court, other panels of this court have noted similar factual distinctions in cases interpreting the constitutionality of the duration of a traffic stop. In *State v. Lewis*, 54 Kan. App. 2d 263, Syl. ¶ 6, 399 P.3d 250 (2017), *rev. denied* December 22, 2017, the panel held: "Unless simultaneously engaging in activities related to the completion of the routine traffic stop, law enforcement officers cannot engage in activities that focus solely on preparing for a dog sniff during the stop. Such actions

14

unreasonably prolong a traffic stop." Another panel in *State v. Schooler*, No. 116,636, 2017 WL 2212102, at *5 (Kan. App.) (unpublished opinion), *rev. granted* 306 Kan. 1329 (2017), found it was not improper for the officer to "perform a criminal record check on [the driver] while he was checking his driver's license and the registration of the vehicle he was driving." Each panel reasoned that a criminal history check that occurs at the same time as the other checks is permissible as held in *Jimenez*. But the decisions also support a finding that the factual circumstances surrounding how an officer conducts or orders the records checks can impact the validity and the permissible duration of a traffic stop.

The panel in *Lewis* reiterated that *Rodriguez* permits two types of police inquiries during the mission of a traffic stop: ordinary inquiries incident to the traffic stop and safety precautions which are not taken solely to facilitate the "'investigation into other crimes.'" *Lewis*, 54 Kan. App. 2d at 271 (quoting *Rodriguez*, 135 S. Ct. at 1616). But significantly, the *Lewis* panel did *not* include a criminal history check as a routine part of a traffic stop; rather, it concluded that the law permits an officer to "request an individual's license and registration, run a computer check, and issue the ticket" during a routine traffic stop. 54 Kan. App. 2d at 271 (citing *State v. Morlock*, 289 Kan. 980, 986, 218 P.3d 801 [2009]). The panel concluded that the officer's safety precaution—requiring the occupant to exit the vehicle in order to conduct a dog sniff safely—was an improper detour that prolonged the mission of the traffic stop so that the officer could conduct the dog sniff absent reasonable suspicion that other criminal activity was afoot. 54 Kan. App. 2d at 283.

Given that traffic stops are dangerous for police officers, we have no quarrel with the general proposition that safety concerns typically associated with a traffic stop would in many, if not most, cases justify a criminal history check contemporaneously with routine law enforcement checks of a driver's license, outstanding warrants, and the validity of the vehicle's registration and insurance. In that sense, we agree with the panel

in *Jimenez.* But more persuasive to us is that at least two other panels of this court recognize that the factual circumstances of when and how an officer orders a criminal history check may affect the constitutionality of the stop. We therefore decline the State's invitation to adopt *Jimenez'* bright-line rule approach—that all traffic stops permit criminal history checks as part of a traffic violation because traffic stops are inherently dangerous.

As outlined in *Lewis* and *Schooler* above, the officer's manner in conducting the relevant records checks and safety precautions may affect the validity of the inquiry and the traffic stop itself. See *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015) (holding ex-felon registration check which includes check on criminal history and whether properly registered at address for prior crimes impermissible); *State v. Sanders*, 248 F. Supp. 3d 339, 345-346 (D.R.I. 2017) (first holding that "most courts . . . have held that police officers are permitted to conduct criminal background checks in the interest of officer safety without demonstrating additional justification under the Fourth Amendment" but distinguishing its case from *Evans* based on particular "context" of each traffic stop). The United States Supreme Court emphasized in *Rodriguez* that "[t]he *reasonableness* of a seizure . . . depends on what the police in fact do." (Emphasis added.) 135 S. Ct. at 1616. "If an officer can complete the traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" 135 S. Ct. at 1616 (quoting *Caballes*, 543 U.S. at 407). Moreover, challenges under the Fourth Amendment generally do not support the use of bright-line rules given "the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996).

Here, the issue of the criminal history check relates to the permissible duration of a government seizure imposed on individuals subject to a traffic stop. The treatment of the criminal history check here differs from other officer safety actions taken by law enforcement during a stop because it does not necessarily reduce an immediate safety

16

concern—such as moving a person away from a suspected weapon in a vehicle or ensuring that a person does not have a weapon immediately available for his or her use against the officer. Conversely, the criminal history check during a traffic stop does not necessarily require that the officer have a reasonable suspicion that the person is armed or dangerous; rather, it helps the officer deal with safety concerns by becoming "better appri[s]ed of whether the detained motorist might engage in violent activity during the stop." *Holt*, 264 F.3d at 1222. A bright-line rule would permit an officer to conduct criminal history checks or any records check regardless of how the check occurs, when the officer orders the check in relation to the other routine traffic-related investigations, or how long the check takes, all of which overlook the fact-specific inquiry required when reviewing Fourth Amendment challenges.

D.     *The Criminal History Check Was Unjustified.*

Applying the case-by-case approach, we agree with the district court and fail to see the justification in Ricard's request for a criminal history check under the facts before us. Of particular concern is the lack of an officer safety justification.

Here, Ricard stated that he stopped the truck because the license plate was obstructed. Although the lawfulness of the stop is not an issue, the reason for the stop is relevant to the question of how much time was necessary to complete the mission of issuing a ticket for the violation. See *Rodriguez*, 135 S. Ct. at 1614 (the "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'").

The district court found that Ricard did not have any concerns for his safety at the time he requested the criminal history check. Ricard admitted that he did not feel concerned for his safety during this particular traffic stop, and his testimony regarding his actions during the stop support a lack of safety concerns. Ricard permitted Stephens to

17

walk around him and search for his driver's license in the back passenger seat, did not pat-down Stephens during this encounter, and had Stephens accompany him to his patrol car. There, Ricard performed the routine check on his in-car computer of Stephens' driver's license, whether any outstanding warrants existed, and the validity of the vehicle's registration and insurance. Significantly, it was only after Ricard received the results of his in-car computer check—which confirmed that Stephens had a valid driver's license, he had no outstanding warrants, and the vehicle was properly registered and insured—that Ricard contacted dispatch to request a criminal history check on Stephens.

Based upon this record, we agree with the district court's finding that Ricard did not use the criminal history check as a safety precaution within the mission of the traffic stop because this finding is supported by substantial evidence. Ricard's criminal history check request took place nearly four minutes after the stop. About six minutes then elapsed between Ricard's criminal history request from dispatch and when dispatch next contacted Ricard. It was during those six minutes that Ricard conducted the dog sniff and during which the dog alerted to the presence of drugs. Ricard's act of requesting dispatch to conduct a criminal history check, which gave him time to have Scooby perform the dog sniff of the vehicle, is precisely the kind of inquiry that *Rodriguez* forbids because it morphed the traffic stop into an "[o]n-scene investigation into other crimes" and impermissibly utilized a safety precaution—a criminal history check—to facilitate a detour to a drug investigation. See 135 S. Ct. at 1616.

By the time Ricard requested the criminal history check, he had no safety concerns and he already knew that Stephens' driver's license and vehicle checked out. Because a traffic stop seizure must end "when tasks tied to the traffic infraction are—or reasonably should have been—completed[,]"135 S. Ct. at 1614, Ricard was compelled to release Stephens at that point. The time it took for dispatch to conduct a criminal history check, which in turn gave Scooby time to conduct a dog sniff, impermissibly extended the duration of the stop. We agree with the district court's conclusion that the seizure that

18

occurred during the dog sniff violated the Fourth Amendment, and the evidence must be suppressed.

Affirmed.