NOT DESIGNATED FOR PUBLICATION

No. 127,006

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

KAYLEE MICHELLE HOGUE,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; JASON E. GEIER, judge. Submitted without oral argument. Opinion filed February 14, 2025. Affirmed.

*Lindsay Kornegay*, of Kansas Appellate Defender Office, for appellant.

*Carolyn A. Smith*, assistant district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and COBLE, JJ.

PER CURIAM:  After a bench trial, the Shawnee County District Court found Kaylee Michelle Hogue guilty of possession of methamphetamine and possession of drug paraphernalia. Before trial, Hogue moved to suppress evidence derived from her stop, arguing that the law enforcement officer had illegally searched her car. The district court denied that motion. Hogue now appeals, claiming the district court erred by denying the motion to suppress. Finding no error, we affirm.

1

*Factual and Procedural Background*

On the evening of October 8, 2020, a clerk at the Petro Deli gas station in Shawnee County called police to check on a woman who had been sleeping for 30 to 40 minutes in her vehicle parked at a gas pump. Deputy Trevor LaFarge from the Shawnee County Sheriff's Office responded to conduct a welfare check of the woman, later identified as Hogue. The keys to the vehicle were in her pocket.

When LaFarge arrived around 9:20 p.m., he saw a white SUV at a pump and a person in its driver's seat slumped over the center console. He knocked on the driver's side window and shined his flashlight into the vehicle to try to wake the driver, Hogue. At one point, Hogue sat up, but she gave no response, placed her head in her hand, and appeared to still be sleeping. She then slumped back over the center console. LaFarge continued to loudly knock on the driver's side window and the windshield, shining his flashlight and strobe light at Hogue, and calling to her through the window.

After about a minute of trying to rouse Hogue the second time, Lafarge saw her sit up. LaFarge saw that her face was covered in sweat, despite the temperature being in the 50's that evening. He instructed Hogue to open the vehicle's door, and she complied. LaFarge then began assessing her orientation by asking her questions about time, place, and her situation. When asked why she was "soaked in sweat," Hogue replied because it was hot. LaFarge determined that Hogue did not need medical assistance and was not otherwise in distress based on her ability to articulate her current situation and answer his questions.

But while talking to Hogue, LaFarge observed that Hogue was sweating profusely, her pupils were unusually small, her speech was slurred, and she could barely stay upright in her seated position. She stated that she had been driving to the casinos in Jackson County, but she became tired, so she pulled over at the gas station to sleep.

2

LaFarge testified that because of his observations, he shifted from a welfare check to an investigatory stop "almost immediately" once he began talking with Hogue. LaFarge asked Hogue if she had been drinking, and she replied that she had had half a shot of whiskey approximately three or four hours earlier. She denied having taken any medication or drugs and denied having any narcotics in the vehicle. This occurred within about three minutes after LaFarge finally woke Hogue and spoke with her.

Once Hogue's safety was established, LaFarge began an investigatory stop. He determined more than a welfare check was needed because of "several things."

> "Obviously, an individual sleeping in their vehicle at a gas pump is something that's not traditional. The moment we made physical and verbal contact, I observed that her pupils appeared small, which is uncharacteristic. Obviously, her sweating was a concern to mind. Her slurred speech, red watery eyes, just her general lethargic behavior and inability to maintain her balance while sitting in the vehicle. I mean, there were several indications that I continued to observe and things that she would say that were concerning to me."

LaFarge asked Hogue to conduct various impairment tests. She performed two split-attention tests while she was still seated in her vehicle: a finger-counting test and an alphabet-reciting test. LaFarge testified that she "was able to perform the tests, but not fluidly. . . . [S]he had to pause several times [and] think about what she was doing before she was able to make it through it." He then asked Hogue to exit the vehicle where he conducted standard field sobriety tests.

He placed Hogue in the back of his patrol vehicle and administered a preliminary breath test, which returned a result of 0.0 blood alcohol content. Although Hogue had no alcohol in her system when he administered the test, he had been trained as a drug recognition expert and believed she was impaired by some other substance. See K.S.A. 8-1567(a)(4) (prohibiting operating a vehicle while under the influence of any drug or

3

combination of drugs to a degree that renders the person incapable of safely driving a vehicle). He then arrested Hogue for driving under the influence and searched the car. He testified that the search was incident to her arrest, as he believed he would find evidence in the car of what caused her impairment.

During his search, he discovered a small purse that contained multiple baggies of a crystalline substance and a pipe. He also located several pill bottles, some prescribed to her and some not. Based on his training and experience, he believed the white crystalline substance was methamphetamine and the pipe was used to smoke it.

After the crystalline substance was confirmed to be methamphetamine, Hogue was charged with possession of methamphetamine, a severity level 9 drug felony, and possession of drug paraphernalia, a class B misdemeanor. Before trial, Hogue moved to suppress the evidence found during LaFarge's search, arguing that his investigation was not a welfare check but an illegal seizure. In response, the State argued that LaFarge had properly expanded the welfare stop into an investigatory stop after he reasonably suspected that Hogue was committing a crime.

At the evidentiary hearing on Hogue's motion, the State called LaFarge to testify and admitted his body camera footage. He testified that initially he was just trying to figure out why she was asleep in the vehicle. But his welfare check turned into an investigatory stop almost immediately upon speaking with Hogue—she showed signs of impairment when she opened the car door and answered a couple of preliminary questions.

> "At that time again, I was concerned why she was sweating as profusely as she was, especially with the temperatures that it was. I was trying to determine if she recalled where she was at, where she was coming from; all the things that we would typically ask

4

somebody just to see if they were cognitively aware of what was going on and cognitively aware of what happened prior to where she was at."

LaFarge quickly became concerned that Hogue was impaired, but she was not experiencing a medical emergency, and the welfare check turned into an investigatory stop.

After the evidentiary hearing, the district court denied Hogue's motion to suppress, finding that LaFarge had reasonable suspicion to expand the welfare check into an investigatory stop.

"Here, Deputy LaFarge properly conducted a welfare check. During this check, the deputy quickly noticed signs [Hogue] was impaired, suggesting a reasonable suspicion of criminal conduct: driving while intoxicated. It was not necessary for law enforcement to see [Hogue] drive her car. The deputy was presented with enough evidence to suggest a possibility [Hogue] operated her car under the influence . . . . Thus, the scope of the encounter was not invalid under the Fourth Amendment, and the search of [Hogue's] car was permissible since the officer had a reasonable suspicion evidence of the DUI might be found in [Hogue's] car."

LaFarge later testified at Hogue's bench trial. There, Hogue contemporaneously objected to the admission of evidence taken from the car. Still, the district court found her guilty of possession of methamphetamine and possession of drug paraphernalia. The district court sentenced her to a controlling sentence of 17 months' imprisonment, then suspended that to 12 months of supervised probation.

Hogue timely appeals.

5

*Did the District Court Err by Denying the Motion to Suppress?*

Hogue's challenge to the district court's denial of her motion to suppress evidence is two-part. She first argues that the evidence fails to show that LaFarge conducted a welfare check, arguing that the encounter began as an investigatory detention. In the alternative, she argues that LaFarge illegally exceeded the scope of the welfare check because he had no reasonable suspicion of criminal activity when he subjected her two impairment tests and began his criminal investigation.

When a defendant moves to suppress evidence, the State must prove to the district court that the search and seizure was lawful using a preponderance of the evidence standard. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). When reviewing a district court's ruling on a motion to suppress, we review the factual findings for substantial competent evidence and the court's ultimate legal conclusion de novo. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). Similarly, "[w]hether reasonable suspicion exists is a question of law, and appellate courts review this question with a mixed standard of review, determining whether substantial competent evidence supports the district court's factual findings, while the legal conclusion is reviewed de novo." *City of Wichita v. Molitor*, 301 Kan. 251, 264-65, 341 P.3d 1275 (2015).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). In reviewing the factual findings, an "appellate court does not reweigh the evidence or assess the credibility of witnesses." *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State carries the burden to prove the search and seizure were lawful. K.S.A. 22-3216(2); *State v. Cash*, 313 Kan. 121, 126, 483 P.3d 1047 (2021).

There are generally four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops (which include welfare checks), and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). These encounters must not violate the citizen's constitutional rights. The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Kan. Const. Bill of Rights, § 15. The United States Supreme Court has interpreted this prohibition to require law enforcement officers who seize or search an individual to either have a warrant or rely on a recognized exception to the warrant requirement. *State v. Sanders*, 310 Kan. 279, 285, 445 P.3d 1144 (2019) (citing *Riley v. California*, 573 U.S. 373, 382, 134 S. Ct. 2473, 189 L. Ed. 2d 430 [2014]).

One of these exceptions is when an officer performs a welfare check. The Kansas Supreme Court has found it reasonable to "seize" an individual to protect public safety. See *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992), *disapproved of in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). "[A]s long as there are objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate." *State v. Ellis*, 311 Kan. 925, 929-30, 469 P.3d 65 (2020).

But a welfare check must be unrelated to "'the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *State v. Messner*, 55 Kan. App. 2d 630, 631, 419 P.3d 642 (2018). "[A]s with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop." *State v. Gonzales*, 36 Kan. App. 2d 446, 455, 141 P.3d 501 (2006). In applying the public safety rationale to justify a police-citizen encounter, courts scrutinize the facts "so the protections of the Fourth Amendment are not emasculated." 36 Kan. App. 2d at 455.

For a welfare check to properly transform into an investigatory detention that complies with the Fourth Amendment, the law enforcement officer must have reasonable suspicion that the individual is committing, has committed, or is about to commit a crime or traffic infraction. *Ellis*, 311 Kan. at 931.

Reasonable suspicion requires less proof than wrongdoing by a preponderance of the evidence.

"Reasonable suspicion is a lower standard than probable cause, and '[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.' *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013). In determining whether reasonable suspicion exists, the court must judge the officer's conduct in light of common sense and ordinary human experience under the totality of the circumstances. This determination is made with deference to a trained officer's 'ability to distinguish between innocent and suspicious circumstances,' while recognizing that it represents a 'minimum level of objective justification' and is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' *Pianalto*, 301 Kan. at 1011 (quoting *Martinez*, 296 Kan. at 487)." *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017).

The parties stipulated before the district court that LaFarge initially arrived on the scene to conduct a welfare check on Hogue. But Hogue argues that no substantial competent evidence shows that LaFarge actually conducted a welfare check once he arrived. We disagree.

As discussed above, when LaFarge arrived on the scene he spent several minutes knocking on Hogue's vehicle's windows, calling to her, and shining his flashlight (both the simple light and using its strobe function) into her vehicle to try to rouse her. When she finally woke up, LaFarge asked her questions to try to determine why she was sleeping in her vehicle parked at a gas pump and why she was sweating so much when

8

the temperature was cool—50 degrees. LaFarge was checking Hogue for possible distress. But he did not find an individual who needed medical assistance.

Rather, once LaFarge was able to wake up Hogue and begin talking with her, he quickly believed that she did not need medical assistance but was under the influence of a substance. Later in the encounter, LaFarge told Hogue that he did not believe any of her symptoms were caused by a medical emergency or he would have taken her to the hospital much earlier.

Hogue's argument essentially asks this court to establish that an officer must spend a predetermined amount of time asking about a citizen's welfare before we can find that a welfare check occurred. We decline that invitation. Challenges to searches and seizures under the Fourth Amendment generally do not support the use of bright-line rules because of the fact-specific nature of the reasonableness inquiry. *State v. One 2008 Toyota Tundra*, 55 Kan. App. 2d 356, 370, 415 P.3d 449 (2018); see *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."). LaFarge's unrefuted testimony and the stipulated facts provide substantial competent evidence supporting the district court's conclusion that LaFarge conducted a welfare check on Hogue.

We thus consider Hogue's next argument—that LaFarge illegally expanded the scope of the welfare check because he lacked a reasonable suspicion of criminal activity. When, as here, an officer conducting a public safety stop becomes assured that the person does not need assistance, "any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment." *Ellis*, 311 Kan. at 930. For a welfare check to properly transform into an investigatory detention that does not violate the Fourth Amendment, the law enforcement officer must have reasonable suspicion the

9

individual is committing, has committed, or is about to commit a crime or traffic infraction. 311 Kan. at 931.

Our review of the record shows that the district court's factual finding that LaFarge had reasonable suspicion is supported by substantial competent evidence. At the suppression hearing, LaFarge testified that Hogue's answers to his orientating questions indicated that she did not need medical assistance. But her slurred speech, sweating profusely in 50-degree weather, her unusually small pupils, her difficulty in staying upright in her seat, coupled with the difficulty LaFarge had waking her, indicated that she was impaired. By the time the officer determined that Hogue did not need assistance, he had reasonable suspicion based on these facts that Hogue had committed or was about to commit the crime of driving under the influence. The drug evidence found in the search incident to arrest was thus not improperly obtained. See *State v. Martin*, 318 Kan. 538, 560, 544 P.3d 820 (2024) (Incident to a lawful arrest, an arresting officer may contemporaneously search the arrestee's person and the area within the arrestee's immediate control, including personal property immediately associated with the person of the arrestee.).

LaFarge had reasonable and articulable grounds for suspecting criminal activity sufficient to transform the public safety stop into a legal investigatory detention. See *State v. Bennett*, No. 125,386, 2023 WL 5811136, at *1 (Kan. App. 2023) (unpublished opinion) (finding that by the time officers determined Bennett did not need assistance, they had reasonable and articulable suspicion Bennett had committed or was about to commit a crime—driving under the influence). The district court thus did not err by denying Hogue's motion to suppress.

Affirmed.

10