In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-2935

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PARIS YANCEY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 17-cr-40067 — **Sara Darrow**, *Chief Judge.*

_____

ARGUED MAY 29, 2019 — DECIDED JUNE 27, 2019

_____

Before KANNE, SYKES, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* This case concerns a traffic stop in
Rock Island, Illinois. While two police officers were arresting
the driver of a vehicle on an outstanding warrant, they recog-
nized defendant Paris Yancey riding shotgun. Based on their
past interactions with Yancey, as well as their familiarity with
a contact sheet labeling him as potentially armed, the officers
decided to pat him down for weapons. Before they could do
so, Yancey made a run for it. The officers tackled him and saw

a handgun sticking out of his waistband. Yancey was subsequently convicted of felony possession of a firearm.

Yancey appeals the admission of the handgun evidence on Fourth Amendment grounds, claiming police lacked justification to keep him from leaving the scene. But under Supreme Court precedent, police officers can detain passengers in a car while a stop is ongoing if they have a lawful reason to seize the driver. It is undisputed that the officers lawfully stopped the car in which Yancey rode as a passenger. Because that stop was still lawfully ongoing when Yancey tried to flee, it was not unreasonable for the officers to detain him, so we affirm his conviction.

## I. Background

On July 1, 2017, at 1:48 a.m.,[1] Rock Island Police Officer Zachary Costas was on patrol when he recognized a car belonging to a woman named Dorothy Davis. Costas also recognized the driver: not Dorothy Davis, but her daughter, Deborah McCorkle. Costas believed McCorkle had an outstanding arrest warrant a few counties over, so he followed the car. When dispatch confirmed the warrant remained outstanding, Costas pulled McCorkle over.

At 1:50 a.m., Costas approached the vehicle to speak with McCorkle. Yancey sat in the front passenger seat. Costas questioned McCorkle about her name and the warrant for her arrest. During the conversation, Costas referred to Yancey by an

---

[1] All time stamps come from the body cameras of the two officers at the scene. We include the times because the sequence and duration of the stop are important to our evaluation.

incorrect name, and Yancey corrected him, identifying himself as Paris Yancey.

At this point, Costas recognized Yancey. He recalled two run-ins in recent months during which Yancey was "very confrontational" with police officers, though he was not arrested in either encounter. During one of these encounters, dispatch ran Yancey's name and informed Costas that Yancey was on parole for a weapons offense and known to carry weapons.[2] Costas had also seen a police contact sheet on Yancey, which stated, "[o]fficers should use caution when dealing with … Paris Yancey as [he] may be armed." The contact sheet had been issued a month earlier and was read to officers at roll call every day.

At 1:51 a.m., Officer Tony Zier arrived to assist with the stop. Zier immediately recognized Yancey from a burglary investigation he conducted in 2016. Yancey was not a suspect in the burglary, but he had behaved in an "agitated" manner and was upset when police interviewed him. Zier was also familiar with the contact sheet mentioning Yancey.

Zier walked up to the car and began speaking with Yancey to keep him occupied while Costas conducted the stop. Zier testified he pretended not to recognize Yancey so he would not flee. At 1:53 a.m., Costas asked McCorkle to step out of her car and handcuffed her. Yancey asked Zier if he could leave; Zier told him to wait. At 1:54 a.m., as Costas walked McCorkle toward his squad car, Yancey again asked if he

---

[2] In the district court, the parties disputed whether Yancey was on parole for a weapons offense or for a criminal trespass offense. Regardless, Costas knew Yancey had been convicted for a weapons offense in 2001, and Costas testified he believed Yancey was on parole for that conviction.

could leave. Zier instructed him to wait "a couple minutes, and we'll get you out of here." To Zier, Yancey seemed nervous about wanting to leave the traffic stop. At this time, due to Yancey's nervousness and his history of carrying weapons, Zier decided he needed to frisk Yancey before letting him leave the traffic stop.

The next few minutes unfolded as follows:

- At 1:55 a.m., McCorkle was placed in the backseat of Costas's squad car. She told Costas she wanted Yancey to take her car. Costas said that would be fine if Yancey had a valid driver's license. Yancey again asked to leave, and Zier replied he could not leave yet. Costas walked back to the car and saw Yancey, still in the passenger seat, holding McCorkle's purse. When asked, Yancey handed the purse to Costas.

- At 1:56 a.m., Yancey asked a fourth time if he could go. Costas asked him to "hold on" and asked dispatch to run Yancey's name. While waiting for the reply, Costas began to search McCorkle's purse. Zier asked Yancey to step out of the car and asked if he had any weapons on him. Yancey did not answer and just said, "Come on, man." Zier said he would conduct a protective pat down and Yancey objected, saying he had not done anything wrong.

- At 1:57 a.m.—30 seconds after stepping out of the car and before Zier could pat him down—Yancey started running away. Zier and Costas chased him and tackled him, then wrestled him into handcuffs.

> As they rolled Yancey onto his side, Costas saw a black handgun in Yancey's waistband.

- At 1:58 a.m., police officers arrested Yancey and placed him in Zier's squad car.

The encounter lasted about eight minutes. When Yancey ran, the officers had yet to confirm whether Yancey possessed a valid driver's license. They were also finishing the search of McCorkle's purse, and considering McCorkle's request for turn over of her car and personal belongings to Yancey.

The government charged Yancey with possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moved to suppress the gun and any statements he made to law enforcement, arguing the officers lacked probable cause to seize him and lacked reasonable suspicion to pat him down for weapons. After an evidentiary hearing, the district court denied Yancey's motion to suppress. The court found Costas and Zier's testimony to be "absolutely credible," and commented on the small size of the law enforcement community in Rock Island. The court believed the officers when they said they recognized Yancey from recent encounters and from the contact sheet stating he was known to carry weapons.

The court concluded that the traffic stop remained ongoing when Zier told Yancey he could not leave. Though McCorkle was secured in the squad car, the officers had not figured out what to do with her car, and had not determined whether Yancey was legally allowed to drive it home. Because the officers had not yet completed necessary actions related to the traffic stop, in the court's view, the stop was still ongoing.

To the district court, this entitled the officers to keep Yancey from leaving the scene at the time he fled.

Yancey pleaded guilty to the charge but reserved the right to appeal his motion to suppress. He was sentenced to 71 months' imprisonment and three years' supervised release.

## II. Discussion

Yancey argues the officers violated the Fourth Amendment twice during the traffic stop: first, when they prevented him from leaving the scene after McCorkle was in Costas's squad car, and second, when they sought to pat him down for weapons without reasonable suspicion he was armed and dangerous.

We need not reach Yancey's second argument because Yancey fled before Zier could conduct the pat down. As the district court noted, no pat down means no need for reasonable suspicion he was armed and dangerous. *Cf. Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (requiring reasonable suspicion the car passenger was armed and dangerous where a patdown actually occurred). We need only examine whether a lawful investigatory stop remained in progress that justified keeping Yancey at the scene. On appeal, we review the district court's fact findings for clear error and its legal findings de novo. *United States v. Richmond*, 924 F.3d 404, 410 (7th Cir. 2019).

A traffic stop is lawful under the Fourth Amendment "when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). An officer may detain the passengers as well as the

driver while the stop is ongoing, *Johnson*, 555 U.S. at 327, and an officer "may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

Yancey concedes that, at least in the beginning of the encounter, the traffic stop and his detainment were legal because McCorkle's outstanding arrest warrant gave the officers legal justification to pull over the car. Yancey instead argues that the justification for the traffic stop ended once McCorkle was handcuffed and put in Costas's squad car. From that point, Yancey contends the police lacked any reasonable suspicion he was engaged in illegal activity that would justify extending the traffic stop (and his detainment). We must decide whether reasonable justification existed to continue the traffic stop between the securing of McCorkle in the squad car at 1:55 a.m. and Yancey's attempt to flee the scene at 1:57 a.m.

A traffic stop is reasonable only for the amount of time it takes to complete "the seizure's 'mission'—to address the traffic violation that warranted the stop … and attend to related safety concerns … ." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). This includes "certain unrelated checks during an otherwise lawful traffic stop." *Rodriguez*, 135 S. Ct. at 1615. "An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. "The scope of the detention must be carefully tailored to its underlying justification," *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion), and cannot be extended by unrelated activities.

Here, the officers' purpose was to stop and arrest McCorkle for her outstanding arrest warrant. Though Costas and Zier had secured McCorkle by 1:55 a.m., attendant tasks remained unaddressed. The first, for administrative reasons, was the search of McCorkle's purse. Rock Island Police Department policy required the officers to do an inventory search of any handbags found in the vehicle and make a list of valuables therein, to protect the department from later claims of property damage or theft. *See United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010) (permitting inventory searches if conducted "as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures"). Costas's inventory search of McCorkle's purse was still taking place at 1:57 a.m.

Next, there was the question what to do with McCorkle's car. Having decided not to impound it, Costas and Zier had not resolved who should take custody of it. McCorkle had requested the officers let Yancey take the car, but by 1:57 a.m. they had yet to verify if Yancey had a valid driver's license and could legally drive the car. "Authority for the seizure … ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. Two minutes had passed since McCorkle was placed in Costas's car—not an unreasonable amount of time for Costas and Zier to still be handling these issues. Because of these unresolved matters, the traffic stop was still ongoing when Yancey attempted to flee the scene. The officers therefore had legal justification to continue to detain him, including stopping Yancey when he tried to run away, so the handgun they saw when they caught him was properly admitted into evidence.

### III. Conclusion

For these reasons we AFFIRM the district court's judgment.