FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee*,

v.

SHANE ALAN NAULT,
              *Defendant-Appellant.*

No. 20-30231

D.C. No.
4:19-cr-00051-
BMM-1

OPINION

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, District Judge, Presiding

Argued and Submitted October 4, 2021
Seattle, Washington

Filed July 21, 2022

Before: A. Wallace Tashima, Milan D. Smith, Jr., and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Dissent by Judge Tashima

**SUMMARY**[*]

---

**Criminal Law**

The panel affirmed the district court's denial of Shane Nault's motions to suppress evidence and to traverse a search warrant that resulted in the discovery of methamphetamine and a firearm in Nault's vehicle.

Nault pled guilty to possession with intent to distribute methamphetamine and felon in possession of a firearm, but reserved the right to appeal the denial of the motions. An officer stopped the vehicle after learning that the vehicle—whose registered owner, Joei Ross, had an outstanding arrest warrant—was in the parking lot of a gas station.

In his motion to suppress, Nault argued that the officer unconstitutionally prolonged the vehicle stop when he asked Nault to provide his license, registration, and proof of insurance because the suspicion that motivated the stop had evaporated once the officer determined that Ross was not in the vehicle. The government countered that the stop was supported by independent reasonable suspicion because the officer began to suspect that Nault was intoxicated shortly after initiating contact. Assuming without deciding that the officer lacked reasonable suspicion that Nault was intoxicated until he first asked Nault whether he had been drinking, the panel held that even if the officer's request came before he developed independent suspicion, the officer's continuation of the stop to request Nault's documents did not violate the Fourth Amendment because

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that request fell within the mission of the stop. The panel wrote that the circumstances of the officer's encounter with Nault implicate the same vehicle safety purpose discussed in *Rodriguez v. United States*, 575 U.S. 348 (2015), under which a routine document check would remain part of the officer's mission even when the suspicion that justified a stop was based on an outstanding warrant rather than a traffic violation. The panel wrote that because the mission of the officer's stop encompassed his routine request for documents, Nault was lawfully detained when the officer began noticing signs of impairment, at which point his continued detention was supported by independent reasonable suspicion of a DUI, and that the evidence acquired during the subsequent investigation and search of the truck—further indicia of intoxication from the officer's field sobriety tests, and a positive alert from a dog sniff— was not tainted. The panel concluded that this evidence, combined with evidence from a controlled methamphetamine buy from Nault out of the same truck a month earlier, amounted to probable cause that amply supported a subsequently issued search warrant; and that the district court correctly denied the motion to suppress.

In his motion to traverse the search warrant, Nault argued that the search warrant affidavit failed to disclose information about the dog sniff and requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Holding that the district court properly denied the motion, the panel wrote that Nault failed to make a substantial preliminary showing that any statement or omission in the affidavit was intentionally or recklessly false or misleading, where an expert report provided by Nault at most establishes that the canine's alert was unreliable on a single unrelated occasion.

Dissenting, Judge Tashima wrote that the majority should have analyzed this case not as a traffic stop under *Rodriguez*, but as an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968); that asking Nault for his license, registration, and proof of insurance was not part of the officers' mission, which was to look for and arrest Ross; that the driving credentials of Nault, who was not traveling on or parked on a public street or highway, were no more suspect than those of every other motorist on the road that day; and that the officers therefore were not permitted under the Fourth Amendment to detain him in order to conduct a traffic safety investigation.

---

## COUNSEL

Elizabeth T. Musick (argued), Musick & Tierney Law PLLC, Bozeman, Montana, for Defendant-Appellant.

Jeffrey K. Starnes (argued), Assistant United States Attorney; Leif M. Johnson, Acting United States Attorney; United States Attorney's Office, Great Falls, Montana; for Plaintiff-Appellee.

**OPINION**

NGUYEN, Circuit Judge:

Shane Nault appeals his conviction for possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), and felon in possession of a firearm, 18 U.S.C. § 922(g)(1). Nault pled guilty but reserved the right to appeal the district court's denial of his motions to suppress and traverse the search warrant that resulted in the discovery of methamphetamine and a firearm in his vehicle. Because the district court properly denied both motions, we affirm.

**I.**

**A. Factual Background**

On March 30, 2018, Officer Jordan Chroniger of the Havre Police Department was informed by a drug task force that a vehicle of interest to law enforcement was in the parking lot of the High Land Park Zip Trip gas station in Havre, Montana. Officer Chroniger was told that the vehicle was frequently driven by Nault and a woman named Joei Ross. The vehicle was a red GMC truck registered to Ross. Ross had an outstanding arrest warrant for failure to appear.

As Officer Chroniger's police car entered the parking lot, Ross's truck was idling and a figure was visible in the driver's seat. Officer Chroniger pulled his car directly behind the truck and another police car boxed the truck in from the other side. Officer Chroniger approached on foot, but he could not tell whether the person in the driver's seat was male or female because the windows were tinted.

After reaching the driver's side door, Officer Chroniger identified the driver as Nault. Officer Chroniger promptly

informed Nault that the truck's plates were connected to a warrant for Ross and asked for her whereabouts. Nault responded that she was at the "Emporium," another gas station in town.

Around twenty seconds after initiating contact, Officer Chroniger asked for Nault's license, registration, and proof of insurance. Officer Chroniger described this document request as standard procedure when he encounters someone in control of a motor vehicle.[1] Nault did not have his license, and he spent the next two minutes looking for the truck's registration and proof of insurance.

While Nault was looking for the documents, Officer Chroniger noticed that Nault was "fidgety," "making kind of sporadic movements," that "his pupils were constricted," and he was "sweating profusely" even though it was "a chilly day." To Officer Chroniger, these were signs that Nault was "under the influence of something." Just over a minute after initiating contact, Officer Chroniger asked Nault whether he had been drinking, was nervous, or had taken any illegal drugs.

Although Nault denied being under the influence, Officer Chroniger began to conduct a DUI investigation. Officer Chroniger testified that he patted Nault down for officer safety and discovered brass knuckles and a glass marijuana pipe. Officer Chroniger then administered a series of field sobriety tests, which showed signs of

---

[1] Montana law provides that "[a] peace officer who has lawfully stopped a person or vehicle … may … request the person's name and present address and an explanation of the person's actions and, if the person is the driver of a vehicle, demand the person's driver's license and the vehicle's registration and proof of insurance." Mont. Code Ann. § 46-5-401(2)(a).

impairment.  Officer Chroniger arrested Nault and took him into custody.

After learning of Nault's arrest, agents from the drug task force responded to the scene and arranged for a canine sniff around Nault's truck.  The agent conducting the sniff reported that his canine, Nato, alerted to Nault's driver's side door.

An agent from the drug task force applied for a search warrant.  The affidavit explained Officer Chroniger's encounter with Nault.  It noted that the truck was registered to Ross, who had an outstanding warrant, but that Nault was driving the vehicle and was asked to produce his license, registration, and proof of insurance.  It explained that Nault was arrested on a DUI charge, that a marijuana pipe was found on his person, and that a canine had alerted to the truck's driver's side door.  The warrant also described a controlled buy operation a month earlier, on February 18, 2018, in which an informant purchased methamphetamine from Nault out of the same truck.

A judge issued the warrant, and task force officers searched the truck.  Among other items, officers recovered a pistol and more than 500 grams of methamphetamine.

## B.  Procedural History

Nault was charged with conspiracy to distribute methamphetamine, 21 U.S.C. § 846; possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, 21 U.S.C. § 924(c)(1)(A); and felon in possession of a firearm, 18 U.S.C. § 922(g)(1).

Nault moved to suppress the evidence, arguing that the vehicle stop and resulting canine sniff were unlawful and that the items found in Nault's vehicle were the fruit of the poisonous tree. After a hearing, the district court denied the motion to suppress on the ground that Officer Chroniger had a right to ask for Nault's license, registration, and proof of insurance even after learning that Nault was not the subject of the warrant associated with the truck. The district court concluded that, from that point on, law enforcement acted lawfully and the warrant was supported by probable cause.

Nault then moved to traverse the search warrant and requested a hearing pursuant to *Franks v. Delaware*, 436 U.S. 154 (1978). The district court denied the motion without a hearing.

Nault pled guilty to possession with intent to distribute methamphetamine and felon in possession of a firearm. Nault reserved the right to appeal the denial of his motions to suppress and traverse. Nault was sentenced to concurrent terms of 180 months for the methamphetamine offense and 120 months for the firearm offense. Nault timely appealed.

We have jurisdiction under 28 U.S.C. § 1291.

## II. Motion to Suppress

Reviewing legal conclusions de novo and factual findings for clear error, *see United States v. Dixon*, 984 F.3d 814, 818 (9th Cir. 2020), we hold that the district court properly denied Nault's motion to suppress.

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."

*Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. Accordingly, an officer's inquiries during a traffic stop are constitutionally permissible if they are "(1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019).

Nault argues Officer Chroniger unconstitutionally prolonged the vehicle stop when he asked for Nault to provide his license, registration, and proof of insurance because the suspicion that motivated the stop had evaporated once Officer Chroniger determined that Ross, the subject of the outstanding warrant, was not in the vehicle.

The government counters that the stop was supported by independent reasonable suspicion because Officer Chroniger began to suspect that Nault was intoxicated shortly after initiating contact. But the government's response does not account for the fact that around twenty seconds had elapsed between Officer Chroniger's first contact and his request for Nault's information, and Officer Chroniger did not observe signs of impairment until *after* he asked Nault for his documents.

We need not decide, and therefore assume for purposes of this opinion, that Officer Chroniger lacked reasonable suspicion that Nault was intoxicated until he first asked Nault whether he had been drinking, roughly a minute into the stop.[2] Even if Officer Chroniger's request came before

---

[2] We note that other courts have found stops unconstitutional when prolonged by under thirty seconds before officers developed independent

he developed independent suspicion, Officer Chroniger's continuation of the stop to request Nault's documents did not violate the Fourth Amendment because that request fell within the mission of the stop.

An officer conducting a vehicle stop has interests extending beyond that of "detecting evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 355 (citation and internal quotation marks omitted). An officer's "mission" includes certain "ordinary inquiries incident to the traffic stop," even if they are not required to investigate a particular traffic violation. *Id.* (citation and internal quotation marks omitted). Those inquiries "[t]ypically … involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Such routine checks "ensur[e] that vehicles on the road are operated safely and responsibly." *Id.* By contrast, unrelated inquiries such as dog sniffs or other non-routine checks, which are "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" lack the same "close connection to roadway safety," and must be justified by independent reasonable suspicion. *Rodriguez*, 575 U.S. at 355–56 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)); *see Landeros*, 913 F.3d at 868 (requesting passenger's identification was not part of an officer's traffic stop mission because "[t]he identity of a passenger … will ordinarily have no relation to a driver's safe operation of a

---

suspicion. *See United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018) (twenty seconds of questioning about criminal history); *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir. 2022) (en banc) (twenty-five seconds of questioning about contraband).

vehicle"); *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (ex-felon registration check and dog sniff).

We therefore must determine whether Officer Chroniger's request for documents—as it would be in a typical traffic stop—was "fairly characterized as part of the officer's traffic mission." *Rodriguez*, 575 U.S. at 356; *see also United States v. Cole*, 21 F.4th 421, 429 (7th Cir. 2021) (en banc) (asking whether police inquiries during a stop "are justified by the traffic violation itself or by the 'related' concerns of '[h]ighway and officer safety'" (quoting *Rodriguez*, 575 U.S. at 354)), *cert. denied*, 142 S. Ct. 1420 (2022). To the extent the document request was part of Officer Chroniger's mission, it was an integral component of—rather than a prolongation of—the vehicle stop. *See United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) (explaining that only "[a] stop that is unreasonably prolonged beyond the time needed to perform these tasks [i.e., routine document checks] … violates the Constitution").

The circumstances of Officer Chroniger's encounter with Nault implicate the same vehicle safety purpose discussed in *Rodriguez*. When Officer Chroniger pulled into the Zip Trip parking lot, Nault was sitting in the driver's seat of the truck. The engine was running. There was no indication either that someone else had driven Nault to the gas station or that someone else would drive him away. As with any traffic stop, Officer Chroniger had a strong interest in ensuring that Nault had the ability to legally operate his vehicle. *See Delaware v. Prouse*, 440 U.S. 648, 658 (1979) ("States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that

licensing, registration, and vehicle inspection requirements are being observed.").

It is of no moment that Officer Chroniger never observed Nault commit a traffic violation. In describing the scope of an officer's mission during a traffic stop, the Supreme Court said categorically that it includes the "ordinary inquiries" that Officer Chroniger conducted, without any need for individualized suspicion that a driver poses a risk to others or is violating vehicle licensing, registration, or insurance requirements. *Rodriguez*, 575 U.S. at 355. While an interest in traffic safety would not alone justify a stop to conduct these ordinary inquiries, *see Prouse*, 440 U.S. at 661, these inquiries can be performed during a traffic stop once the intrusion of a stop has been justified by some other lawful basis. *See*, *e.g.*, *Evans*, 786 F.3d at 782, 786 (during traffic stop for unsafe lane changes and following vehicle too closely, officer could run a records check to ensure driver had a valid license and no warrants).

Of course, a traffic violation is not the only lawful basis for an officer to conduct a vehicle stop. An officer may stop a vehicle with reasonable suspicion that a person inside "has committed, is committing, or is about to commit a crime." *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). That can include suspicion that the vehicle's driver is the subject of an outstanding warrant.[3] Under *Rodriguez*'s

---

[3] We have so held in several unpublished dispositions. *See*, *e.g.*, *United States v. Marcum*, 797 F. App'x 278, 281 (9th Cir. 2019); *United States v. Bueno-Martinez*, 443 F. App'x 249, 250 (9th Cir. 2011); *United States v. Castro*, 379 F. App'x 549, 550 (9th Cir. 2010); *United States v. Wallace*, 321 F. App'x 713, 714 (9th Cir. 2009). As here, absent other information, police may infer from the presence of a vehicle on the road

categorical rule, a routine document check would remain part of the officer's mission even when the suspicion that justified a stop was based on an outstanding warrant rather than a traffic violation. That is precisely the case here.

On this point, we find instructive the Seventh Circuit's decision in *United States v. Yancey*, 928 F.3d 627 (7th Cir. 2019). There, officers stopped a vehicle because they believed the driver had an outstanding warrant. *Id.* at 628. After arresting the driver, the officers did not let the passenger drive the vehicle away, instead waiting to determine whether the passenger had a valid license. *Id.* at 629. Without finding reasonable suspicion to continue to hold the passenger, the court held that ensuring the passenger "could legally drive the car" was part of the stop's mission and justified extending the detention for two additional minutes. *Id.* at 631. Similarly, here, although Officer Chroniger's stop was initially justified by an outstanding warrant connected to the vehicle, having conducted a vehicle stop on this basis, Officer Chroniger's mission continued to justify the additional time required to ensure that Nault was lawfully able to drive away the vehicle. *See also United States v. Gurule*, 935 F.3d 878, 884 (10th Cir. 2019) ("[T]he efforts on the part of law enforcement to help locate a licensed driver cannot be characterized as unconstitutionally extending this traffic stop."); *United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017) (extending stop to try to identify someone who could lawfully operate the vehicle could be "fairly characterized as part of [the officer's] mission" (quoting *Rodriguez*, 575 U.S. at 356)).

---

that its registered owner is inside. *See Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020).

We respectfully disagree with the dissent's narrow view of the mission of Officer Chroniger's stop.  As the dissent sees it, that Nault was stopped in an idling vehicle has no bearing on Officer Chroniger's mission.  Dissent at 18–19.  But *Rodriguez* teaches that an officer stopping a vehicle has a broader vehicle safety mission than an officer stopping a pedestrian.  When stopping a vehicle, "[a]n officer . . . may conduct certain unrelated checks" with a "close connection to roadway safety" even though conducting those checks was not the purpose of the stop.  *Rodriguez*, 575 U.S. at 355–56.

We likewise disagree with the dissent's conclusion that the encounter here was not a "traffic stop" and with the importance that the dissent assigns to the "traffic stop" label.  Dissent at 17–19.  The Supreme Court and this court have used "traffic stop" to refer to investigative stops of drivers in their vehicles for reasons other than observed traffic violations.  As an example of a "traffic stop" in *Brendlin v. California*, 551 U.S. 249, 256 (2007), the Supreme Court cited *United States v. Hensley*, which involved a stop of a vehicle in connection with a "wanted flyer."  469 U.S. 221, 223–24 (1985).  We recently described as a "traffic stop" and analyzed under *Rodriguez* an encounter that began when police approached a vehicle stopped in the middle of a busy intersection.  *United States v. Hylton*, 30 F.4th 842, 845, 847 (9th Cir. 2022).

Whether described as a "traffic stop" or an "investigative vehicle stop," the analysis here is the same.  Traffic stops are analyzed under the same *Terry* principles that apply to investigative stops.  *See Arizona v. Johnson*, 555 U.S. 323, 330–32 (2009).  A "traffic stop" is simply "a seizure of the driver" of a vehicle for a "brief investigative stop[]" supported by reasonable suspicion.  *Brendlin*, 551 U.S.

at 255; *Navarette v. California*, 572 U.S. 393, 396 (2014). And *Rodriguez* drew the very concept of "mission" on which our analysis relies from *Terry*. 575 U.S. at 354–55. We therefore do not see the salience of any distinction between a "traffic stop" and an "investigative stop" in this case.

Because the mission of Officer Chroniger's stop encompassed his routine request for documents, Nault was lawfully detained when Officer Chroniger began noticing signs of impairment. Officer Chroniger testified that, while Nault was searching for his documents, he was "fidgety," "his pupils were constricted," and he was "sweating profusely." At that point, Officer Chroniger suspected Nault was intoxicated and proceeded with a DUI investigation. The district court correctly determined that Nault's continued detention from that point on was supported by independent reasonable suspicion of a DUI. *See Evans*, 786 F.3d at 788 ("[A]n officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion," which "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." (citation and internal quotation marks omitted)).

We hold that Officer Chroniger did not unconstitutionally prolong the stop, and the evidence acquired during the subsequent investigation and search of the truck was not tainted. As discussed above, that investigation revealed further indicia of intoxication from Officer Chroniger's field sobriety tests, and a positive alert from a dog sniff. Combined with the evidence from the controlled methamphetamine buy from Nault out of the same truck a month earlier, the search warrant was amply

supported by probable cause.**[4]**    Therefore, no Fourth Amendment violation occurred and the district court correctly denied the motion to suppress.

### III. Motion to Traverse

Nault also argues that the district court erred in denying his motion to traverse the search warrant.   That motion argued in relevant part that the search warrant affidavit failed to disclose information about the dog sniff and requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

"To obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that: (1) 'the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant,' and (2) 'the false or misleading statement or omission was material, *i.e.*, necessary to finding probable cause.'" *United States v. Norris*, 942 F.3d 902, 909–10 (9th Cir. 2019) (quoting *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017)).

We conclude that Nault failed to show his entitlement to a *Franks* hearing.   Nault provided an expert report from a different criminal case addressing a sniff by the same canine, Nato.  The expert determined that the search in that case was

---

**[4]** We need not address Nault's argument that the marijuana pipe and brass knuckles were seized in violation of the Fourth Amendment. While included in the search warrant affidavit, that evidence was not necessary for a finding of probable cause.  *See United States v. Heckenkamp*, 482 F.3d 1142, 1149 (9th Cir. 2007) ("In order to determine whether evidence obtained through a tainted warrant is admissible, '[a] reviewing court should excise the tainted evidence and determine whether the remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" (citation omitted)).

unreliable because Nato was distracted and only alerted the fourth time he was directed to a particular area. At most, this expert report establishes that Nato's alert was unreliable on a single unrelated occasion. The search warrant affidavit only said that Nato had "proven reliable in prior incidents." Even if Nato's sniff had been unreliable on one prior occasion, that does not mean Nato had not been reliable in most or a large number of prior incidents, which is all the affidavit implies. Nor does it establish that the affidavit described Nato's sniff of Ross's truck in a false or misleading way. Moreover, the expert report is dated seven months after the search warrant affidavit, so it could not demonstrate the government was aware of any issues with Nato when the search warrant application was submitted. Nault thus failed to make a substantial preliminary showing that any statement or omission in the affidavit was intentionally or recklessly false or misleading. *See Norris*, 942 F.3d at 910. Accordingly, the district court properly denied the motion to traverse.

**AFFIRMED.**

TASHIMA, Circuit Judge, dissenting:

In *Rodriguez v. United States*, 575 U.S. 348, 355–56 (2015), the Supreme Court held that, when police stop a vehicle for a traffic violation, they may prolong the stop to conduct "ordinary inquiries" incident to the stop, including asking the driver for his license, registration, and proof of insurance, because these inquiries are "part of the officer's traffic mission" and "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." The officers, however, may not prolong a traffic stop to conduct inquiries

unrelated to the purpose of the stop. *Id.* They may not, for example, prolong the stop to investigate other crimes. *Id.* at 356–57.

This case, however, is unlike *Rodriguez*. Police officers approached Shane Nault's vehicle, which was already parked in a private lot, because they were looking for Joei Ross, who was the subject of an outstanding arrest warrant. When they learned that Ross was not present, their mission was completed and their authority for the seizure ended. The officers nevertheless prolonged the stop to thereafter conduct an unrelated traffic safety investigation, asking Nault for his license, registration, and proof of insurance. These inquiries, of course, were not part of the officers' mission in making the stop. The officers therefore violated Nault's Fourth Amendment rights. Because the majority holds otherwise, I respectfully dissent.[1]

The majority's first mistake is to classify the stop that occurred in this case as a "traffic stop." The Supreme Court has treated a traffic stop as "[a] seizure for a traffic violation." *Rodriguez*, 575 U.S. at 354. A traffic stop begins "when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The purpose of the stop is to conduct a "traffic infraction investigation." *Rodriguez*, 575 U.S. at 358.

Here, the police officers did not stop Nault's vehicle for a traffic violation. Instead, they approached an already stopped vehicle because they were looking for Ross, who

---

[1] Regretfully, the majority does not discuss the fact that Nault was "stopped" on a private lot, *i.e.*, not on a public street or highway, and what difference, if any, that fact should make in the majority's "traffic stop" analysis.

was wanted on an arrest warrant. The majority therefore should have analyzed this case as an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), not as a traffic stop under *Rodriguez*. *See United States v. Hensley*, 469 U.S. 221, 223–36 (1985).

The majority's second mistake is to hold that asking Nault for his license, registration, and proof of insurance was part of the officers' mission. Maj. Op. at 9–10. The mission of this stop, however, was to look for and arrest Ross. When that mission was completed, authorization for the stop ended. *Cf. Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). Police officers may not prolong a stop to conduct an investigation that is unrelated to the purpose of the stop. As *Rodriguez* explains, "the tolerable duration of police inquiries . . . is determined by the seizure's 'mission.'" *Id.*

The majority attempts to justify the officers' traffic safety investigation by noting that the officers "had a strong interest in ensuring that Nault had the ability to legally operate his vehicle."[2]  Maj. Op. at 11. But the Supreme Court has squarely held that this important interest does not justify a Fourth Amendment intrusion absent reasonable suspicion of a traffic violation. As the Court explained in *Delaware v. Prouse*, 440 U.S. 648 (1979):

> [I]t is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the

---

[2] Remember that the vehicle was not parked on a public street or highway. *See* footnote 1, *supra*.

driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law.

*Id.* at 650. The majority dismisses *Prouse* on the ground that the officers in this case were prolonging a seizure rather than initiating one. Maj. Op. at 12. But the Fourth Amendment is not so easily brushed aside: "A stop that is unreasonably prolonged . . . violates the Constitution." *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) (as corrected).

The majority alternatively attempts to justify the officers' traffic safety investigation by noting that the lead investigator on the scene, Havre Police Officer Jordan Chroniger, "described this document request as standard procedure when he encounters someone in control of a motor vehicle." Maj. Op. at 6. Crediting Chroniger's testimony, the majority surmises that this case involves a "routine request for documents." Maj. Op. at 15. The record does not support that the officers' request, made of a driver whose vehicle was already parked in a private lot, was routine. But even assuming that it was, this does not make it lawful. The officer in *Prouse* made the same claim, "[c]haracterizing the stop as 'routine.'" 440 U.S. at 650. The Court readily concluded that the officer's actions violated the Fourth Amendment anyway. *Id.* at 651–63. We should do the same here.

The majority finally seeks to justify the officers' traffic safety investigation by reference to case law. Most of the cases upon which the majority relies, however, are bona fide traffic stop cases involving seizures for traffic violations. *See Rodriguez*, 575 U.S. at 351; *United States v. Cole*, 21 F.4th 421, 424 (7th Cir. 2021) (en banc); *United States v. Gurule*, 935 F.3d 878, 881 (10th Cir. 2019) (as revised); *United States v. Landeros*, 913 F.3d 862, 864 (9th Cir. 2019); *Gorman*, 859 F.3d at 709; *United States v. Evans*, 786 F.3d 779, 782 (9th Cir. 2015); *United States v. Lopez-Soto*, 205 F.3d 1101, 1103–04 (9th Cir. 2000). Those cases, therefore, do nothing to advance the majority's reasoning.

The majority also relies on *United States v. Yancey*, 928 F.3d 627 (7th. Cir. 2019), but *Yancey* offers little support for the majority's reasoning. True, the Seventh Circuit referred to the stop in *Yancey* as a "traffic stop," even though officers made the stop to arrest the driver on a warrant, rather than for a traffic violation. But the Seventh Circuit offered no reason for treating the case as a traffic stop. The court simply assumed that the "traffic stop" moniker applied. The court ultimately had no reason to focus on the question, given that the classification of the stop as a traffic stop or an investigatory stop played no role in the outcome of the appeal. The court, in fact, variously referred to the stop as a "traffic stop" and an "investigatory stop." *Id.* at 630. In any event, the seizure in *Yancey* was not a traffic stop; it was an investigatory stop. *See Hensley*, 469 U.S. at 226–36.

It is also true that, in *Yancey*, the officers were permitted to prolong the stop to determine whether Yancey had a valid driver's license. But the circumstances of that case and this one have nothing in common. In *Yancey*, the officers had arrested the driver and assumed custody of the vehicle. They

therefore had to figure out what to do with the vehicle, and, after the driver requested that the officers let Yancey take the vehicle, they had to figure out whether they could entrust Yancey with it. *Yancey*, 928 F.3d at 631. They therefore sought to verify that Yancey was a licensed and lawful driver. *Id.* These tasks were all *necessary* to the mission: the officers could not complete their mission—arresting the driver—without figuring out what to do with the car. *Id.* The officers were therefore justified in prolonging the stop to accomplish these tasks. *Id.*

Here, by contrast, the officers neither arrested the driver nor acquired custody of the vehicle. They did not have to figure out what to do with the vehicle and they were not being asked to entrust the vehicle to Nault. They therefore had no basis for determining whether Nault would serve as a trustworthy custodian. The officers completed their mission when they determined that Ross was not present. There were no "unresolved matters" to address; no "attendant tasks" to complete; no "necessary actions related to the traffic stop" to be performed. *See id.* at 630–31. The officers here, therefore, could not prolong the stop to conduct unrelated inquiries.

I assume that the officers were well-intentioned. Police officers plainly have a vital interest in "ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355 (citing *Prouse*, 440 U.S. at 658–59). Police officers, however, may not prolong a seizure in order to make inquiries or conduct investigations unrelated to the purpose of the seizure, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Here, the driving credentials of Nault, who was not travelling on or parked on a public street or highway, were no more suspect than those of every other motorist on

the road that day.  The officers, therefore, were not permitted under the Fourth Amendment to detain him in order to conduct a traffic safety investigation.  The majority errs by concluding otherwise.

For the foregoing reasons, Nault's motion to suppress should have been granted.  I respectfully dissent.